## SOUTHERN MOTOR CARRIERS RATE CONFER-
## ENCE, INC., ET AL. *v.* UNITED STATES

No. 82–1922.   Argued November 26, 1984—Decided March 27, 1985

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined. STEVENS, J., filed a dissenting opinion, in which WHITE, J., joined, *post*, p. 66.

*Allen I. Hirsch* argued the cause for petitioners. With him on the brief for petitioner Southern Motor Carriers Rate Conference, Inc., was *Simon A. Miller. Bryce Rea, Jr.,* and *Patrick McEligot* filed briefs for petitioner North Carolina Motor Carriers Association, Inc. *William Paul Rodgers, Jr.,* filed briefs for petitioner National Association of Regulatory Utility Commissioners.

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the brief were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Assistant Attorney General Rule, Carter G. Phillips, Catherine G. O'Sullivan, Elliott M. Seiden,* and *Nancy C. Garrison.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Movers Conference et al. by *James A. Calderwood, Edward J. Kiley,* and *Robert R. Harris;* and for the Edison Electric Institute by *S. Eason Balch* and *H. Hampton Boles.*

Briefs of *amici curiae* urging affirmance were filed for the State of Iowa et al. by *Thomas G. Miller,* Attorney General of Iowa, *John R. Perkins* and *William F. Raisch,* Assistant Attorneys General, *Charles M. Oberly III,* Attorney General of Delaware, *Dennis J. Roberts II,* Attorney General of Rhode Island, *Faith A. La Salle,* Special Assistant Attorney General, *Bronson C. La Follette,* Attorney General of Wisconsin, *Michael L. Zaleski,* Assistant Attorney General, *Linley E. Pearson,* Attorney General of Indiana, and *Frank A. Baldwin,* Deputy Attorney General; for the National Industrial Transportation League by *John F. Donelan*

JUSTICE POWELL delivered the opinion of the Court.

Southern Motor Carriers Rate Conference, Inc. (SMCRC), and North Carolina Motor Carriers Association, Inc. (NCMCA), petitioners, are "rate bureaus" composed of motor common carriers operating in four Southeastern States. The rate bureaus, on behalf of their members, submit joint rate proposals to the Public Service Commission in each State for approval or rejection. This collective rate-making is authorized, but not compelled, by the States in which the rate bureaus operate. The United States, contending that collective ratemaking violates the federal antitrust laws, filed this action to enjoin the rate bureaus' alleged anticompetitive practices. We here consider whether the petitioners' collective ratemaking activities, though not compelled by the States, are entitled to Sherman Act immunity under the "state action" doctrine of *Parker* v. *Brown*, 317 U. S. 341 (1943).

I

A

In North Carolina, Georgia, Mississippi, and Tennessee, Public Service Commissions set motor common carriers' rates for the intrastate transportation of general commodities.[1] Common carriers are required to submit proposed rates to the relevant Commission for approval.[2] A proposed

and *Frederic L. Wood;* and for the National Small Shipments Traffic Conference et al. by *Daniel J. Sweeney.*

[1] N. C. Gen. Stat. § 62–130(a) (1982); Ga. Code Ann. § 46–7–18 (Supp. 1984); Miss. Code Ann. § 77–7–217 (1972); Tenn. Code Ann. § 65–15–106(a) (Supp. 1984).

The Interstate Commerce Commission has the power to fix common carriers' rates for the interstate transportation of general commodities. 49 U. S. C. § 10704. The Interstate Commerce Act, however, expressly reserves to the States the regulation of common carriers' intrastate rates, even if these rates affect interstate commerce. 49 U. S. C. § 10521(b).

[2] N. C. Gen. Stat. § 62–134(a) (1982); Ga. Code Ann. § 46–2–25(a) (1982); Miss. Code Ann. §§ 77–7–211 and 77–7–215 (1972); Tenn. Code Ann. § 65–5–202 (1982).

rate becomes effective if the state agency takes no action within a specified period of time. If a hearing is scheduled, however, a rate will become effective only after affirmative agency approval.[3] The State Public Service Commissions thus have and exercise ultimate authority and control over all intrastate rates.

In all four States, common carriers are allowed to agree on rate proposals prior to their joint submission to the regulatory agency.[4] By reducing the number of proposals, collective ratemaking permits the agency to consider more carefully each submission. In fact, some Public Service Commissions have stated that without collective ratemaking they would be unable to function effectively as rate-setting bodies.[5] Nevertheless, collective ratemaking is not compelled by any of the States; every common carrier remains free to submit individual rate proposals to the Public Service Commissions.[6]

---

[3] N. C. Gen. Stat. § 62–134(b) (1982); Ga. Code Ann. § 46–2–25(b) (1982); Miss. Code Ann. §§ 77–7–217 and 77–7–219 (1972); Tenn. Code Ann. § 65–5–203(a) (Supp. 1984).

[4] N. C. Gen. Stat. § 62–152.1(b) (1982); Ga. Code Ann. § 46–7–18 (Supp. 1984), Ga. Pub. Serv. Comm'n Rule 1–3–1–.14 (1983); Response of the State of Mississippi and the Mississippi Public Service Comm'n as *Amici Curiae* in No. 76–1909A (ND Ga. 1977), p. 11; Tenn. Code Ann. § 65–15–119 (Supp. 1984), Tenn. Pub. Serv. Comm'n Rule 1220–2–1–.40, Rules, Regulations and Statutes Governing Motor Carriers, p. 29 (1974).

[5] See, *e. g.,* Response of the State of Mississippi and the Mississippi Public Service Comm'n, *supra,* at 15–16.

Moreover, the uniformity in prices that collective ratemaking tends to produce is considered desirable by the legislature of at least one State and the Public Service Commission of another. See N. C. Gen. Stat. § 62–152.1(b) (1982); Miss. Pub. Serv. Comm'n Rule 39D(4), Rules of Practice and Procedure and General Rules and Regulations under the Miss. Motor Carrier Act of 1938, as amended, p. 37 (1972).

[6] N. C. Gen. Stat. § 62–152.1(e) (1982); Ga. Pub. Serv. Comm'n Rule 1–3–1–.14, *supra;* Response of the State of Mississippi and the Mississippi Public Service Comm'n, *supra,* at 11; Tenn. Pub. Serv. Comm'n Rule 1220–2–1–.40, *supra.*

As indicated above, SMCRC and NCMCA are private associations composed of motor common carriers operating in North Carolina, Georgia, Mississippi, and Tennessee.[7] Both organizations have committees that consider possible rate changes.[8] If a rate committee concludes that an intrastate rate should be changed, a collective proposal for the changed rate is submitted to the State Public Service Commission. Members of the bureau, however, are not bound by the joint proposal. Any disapproving member may submit an independent rate proposal to the state regulatory Commission.[9]

## B

On November 17, 1976, the United States instituted this action against SMCRC and NCMCA in the United States District Court for the Northern District of Georgia.[10] The

---

[7] At the time this action was filed, SMCRC represented its common carrier members before Public Service Commissions in North Carolina, Georgia, Mississippi, Tennessee, and Alabama. SMCRC, however, is no longer active before the Alabama Public Service Commission. Brief for Petitioners 3, n. 2. NCMCA represents its members before the regulatory agency in North Carolina.

[8] SMCRC has a separate rate committee for each of the States in which its members operate—North Carolina, Georgia, Mississippi, and Tennessee. NCMCA, which is concerned solely with matters before the North Carolina Public Service Commission, has only one rate committee.

[9] In addition to providing a forum for their members to discuss rate proposals, the rate bureaus: "[(i)] publish tariffs and supplements containing the rates on which the carriers agree; and [(ii)] provide counsel, staff experts, and facilities for the preparation of cost studies, other exhibits and testimony for use in support of proposed rates at hearings held by the regulatory commissions." 702 F. 2d 532, 534 (1983).

[10] Motor Carriers Traffic Association, Inc. (MCTA), another rate bureau operating in North Carolina, also was named as a defendant. MCTA did not appeal from the District Court's judgment, and is not a party before this Court.

The District Court permitted the National Association of Regulatory Utility Commissioners (NARUC), an organization composed of state

United States charged that the two rate bureaus had violated § 1 of the Sherman Act by conspiring with their members to fix rates for the intrastate transportation of general commodities. The rate bureaus responded that their conduct was exempt from the federal antitrust laws by virtue of the state action doctrine. See *Parker* v. *Brown*, 317 U. S. 341 (1943).[11] They further asserted that their collective rate-making activities did not violate the Sherman Act because the rates ultimately were determined by the appropriate state agencies. The District Court found the rate bureaus' arguments meritless, and entered a summary judgment in favor of the Government. 467 F. Supp. 471 (1979). The defendants were enjoined from engaging in collective rate-making activities with their members.

The Court of Appeals for the Fifth Circuit (Unit B, now the Eleventh Circuit), sitting en banc, affirmed the judgment of the District Court. 702 F. 2d 532 (1983).[12] Relying primarily on *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975), the court held that the rate bureaus' challenged conduct, because it was not compelled by the State, was not entitled to *Parker* immunity. The two-pronged test set forth in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), was irrelevant, the court reasoned, for in that case a public official was the

---

agencies, to intervene as a defendant. See Fed. Rule Civ. Proc. 24(a). Throughout this litigation, the NARUC has represented the interests of the Public Service Commissions of those States in which the defendant rate bureaus operate.

[11] The defendants also contended that their collective ratemaking activities were protected by the *Noerr-Pennington* doctrine. See *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127 (1961); *Mine Workers* v. *Pennington*, 381 U. S. 657 (1965). Both the District Court and the Court of Appeals rejected this defense, and we do not address it. See n. 17, *infra*.

[12] A panel of that court, with one judge dissenting, had affirmed the District Court's judgment. *United States* v. *Southern Motor Carriers Rate Conference, Inc.*, 672 F. 2d 469 (1982).

named defendant.[13]  702 F. 2d, at 539.  The Court of Appeals further held that even if *Midcal* were applicable to a private party's claim of state action immunity, the rate bureaus were not shielded from liability under the Sherman Act.  The court concluded that only if the anticompetitive acts of a private party are compelled can a State's policy be held "clearly articulated and affirmatively expressed" within the meaning of *Midcal.*  702 F. 2d, at 539.

After finding the rate bureaus not entitled to *Parker* immunity, the Court of Appeals held that their collective rate-making activities violated the Sherman Act.  672 F. 2d 469, 481 (1982).[14]  It rejected the rate bureaus' contention that because the regulatory agencies had ultimate authority and control over the rates charged, the federal antitrust laws were not violated.  The Court of Appeals found that "joint ratesetting . . . reduce[d] the amount of independent rate filing that otherwise would characterize the market process," and thus raised the prices charged for intrastate transportation of general commodities.  *Id.,* at 478.  This "naked price restraint," the court reasoned, is *per se* illegal.  *Ibid.*

Four judges strongly dissented.  They argued that *Midcal* was applicable to a private party's claim of state action immunity.  The success of an antitrust action should depend upon the activity challenged rather than the identity of the defendant.  702 F. 2d, at 543–544.  After asserting that *Midcal* provided the relevant test, the dissenters concluded that the lack of compulsion was not dispositive.  Even in the absence of compulsion, a "state can articulate a clear and express policy."  *Id.,* at 546.  The dissent further concluded that a *per se* compulsion requirement denies States needed flexibility in the formation of regulatory programs, and thus is

---

[13] In this case, the Government elected, without explanation, not to name as defendants the state Public Service Commissions that regulated the motor common carriers' intrastate rates.

[14] The en banc Court of Appeals reinstated the part of the panel's opinion that addressed the Sherman Act violation.  702 F. 2d, at 542.

inconsistent with the principles of federalism that Congress intended to embody in the Sherman Act.[15]

We granted certiorari,[16] 467 U. S. 1240 (1984), to decide whether petitioners' collective ratemaking activities, though not compelled by the States in which they operate, are entitled to *Parker* immunity.[17]

## II

In *Parker* v. *Brown*, 317 U. S., at 341, this Court held that the Sherman Act was not intended to prohibit States from imposing restraints on competition.[18] There, a raisin pro-

[15] Judge Clark's separate dissenting opinion criticized the majority for ignoring "the Interstate Commerce Act, public policy, history, and fairness." *Id.*, at 548.

[16] The joint petition for a writ of certiorari was filed by SMCRC, NCMCA, and the NARUC.

[17] Although we granted certiorari on the *Noerr-Pennington* issue as well, see n. 11, *supra*, our disposition of this case makes it unnecessary to consider the applicability of that doctrine to the petitioners' collective ratemaking activities.

[18] JUSTICE STEVENS, noting that "[i]mplied antitrust immunities . . . are disfavored . . . ," *post*, at 67, cites *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533 (1944), for the proposition that "if exceptions are to be written into the Sherman Act, they must come from Congress, and not this Court." *Id.*, at 561. The dissent apparently finds some significance in the fact that no federal statute expressly exempts the petitioners' collective ratemaking activities from the antitrust laws. See *post*, at 70.

The dissent's argument on this point, of course, does not suggest that compulsion should be a prerequisite to a finding of state action immunity. Instead, the logical result of its reasoning would require us to overrule *Parker* v. *Brown* and its progeny, for the state action doctrine is an implied exemption to the antitrust laws. After over 40 years of congressional acquiescence, we are unwilling to abandon the *Parker* doctrine.

JUSTICE STEVENS relies primarily upon *United States* v. *South-Eastern Underwriters, supra*, and *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439 (1945), in the first section of his dissent. Neither of these cases, however, has any bearing on the scope of *Parker* immunity. In *South-Eastern Underwriters, supra*, the Court held only that the "business of insurance is interstate commerce," *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S. 205, 217 (1979), and thus is subject to the Sherman Act's

ducer filed an action against the California Director of Agriculture to enjoin the enforcement of the State's Agricultural Prorate Act. Under that statute, a cartel of private raisin producers was created in order to stabilize prices and prevent "economic waste." *Id.*, at 346. The Court recognized that the State's program was anticompetitive, and it assumed that Congress, "in the exercise of its commerce power, [could] prohibit a state from maintaining [such] a stabilization program . . . ." *Id.*, at 350. Nevertheless, the Court refused to find in the Sherman Act "an unexpressed purpose to nullify a state's control over its officers and agents . . . ." *Id.*, at 351.

Although *Parker* involved an action against a state official, the Court's reasoning extends to suits against private parties. The *Parker* decision was premised on the assumption that Congress, in enacting the Sherman Act, did not intend to compromise the States' ability to regulate their domestic commerce.[19] If *Parker* immunity were limited to the actions of public officials, this assumed congressional purpose would be frustrated, for a State would be unable to implement programs that restrain competition among private parties. A plaintiff could frustrate any such program merely by filing suit against the regulated private parties, rather than the

---

proscriptions. The Court did not suggest that, because of congressional silence, state regulation could not immunize insurance companies from the federal antitrust laws. Instead, it reasoned that *Parker* did not protect the insurance companies because "no states authorize combinations of insurance companies to coerce, intimidate, and boycott competitors and consumers in the manner . . . [there] alleged." 322 U. S., at 562. In *Georgia* v. *Pennsylvania R. Co., supra,* the Court was concerned with whether Congress intended to immunize a *federal* regulatory program from the antitrust laws. See n. 21, *infra.*

[19] In holding that the States were free to regulate "domestic commerce," the *Parker* Court relied upon congressional silence. There are, however, some statements in the legislative history that affirmatively express a desire not "to invade the legislative authority of the several States . . . ." H. R. Rep. No. 1707, 51st Cong., 1st Sess., 1 (1890). See *Cantor* v. *Detroit Edison Co.,* 428 U. S. 579, 632 (1976) (Stewart, J., dissenting).

state officials who implement the plan. We decline to reduce *Parker*'s holding to a formalism that would stand for little more than the proposition that Porter Brown sued the wrong parties. *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579, 616–617, n. 4 (1976) (Stewart, J., dissenting).

The circumstances in which *Parker* immunity is available to private parties, and to state agencies or officials regulating the conduct of private parties, are defined most specifically by our decision in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S., at 97. See *Hallie* v. *Eau Claire, ante,* at 46, n. 10. In *Midcal,* we affirmed a state-court injunction prohibiting officials from enforcing a statute requiring wine producers to establish resale price schedules. We set forth a two-pronged test for determining whether state regulation of private parties is shielded from the federal antitrust laws. First, the challenged restraint must be " 'one clearly articulated and affirmatively expressed as state policy.' " 445 U. S., at 105, quoting *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 410 (1978) (opinion of BRENNAN, J.). Second, the State must supervise actively any private anticompetitive conduct. 445 U. S., at 105.[20] This supervision requirement prevents the State from frustrating the national policy in favor of competition by casting a "gauzy cloak of state involvement" over what is essentially private anticompetitive conduct. *Id.*, at 106.[21]

---

[20] As we hold today in *Hallie* v. *Eau Claire, ante,* at 46, the second prong of the *Midcal* test is inapplicable to municipalities. Although its anticompetitive conduct must be taken pursuant to a clearly articulated state policy, a municipality need not be supervised by the State in order to qualify for *Parker* immunity. See *ante,* at 46.

[21] The dissent argues that a state regulatory program is entitled to *Parker* immunity only if an antitrust exemption is " 'necessary . . . to make the [program] work . . . .' " *Post,* at 74 (quoting *Cantor* v. *Detroit Edison Co., supra,* at 597). This argument overlooks the fact that, with the exception of a questionable dictum in *Cantor, supra,* the dissent's proposed test has been used only in deciding whether Congress intended to immunize a federal regulatory program from the Sherman Act's proscriptions. See, *e. g., Silver* v. *New York Stock Exchange,* 373 U. S. 341, 357

## III

The *Midcal* test does not expressly provide that the actions of a private party must be compelled by a State in order to be protected from the federal antitrust laws. The Court of Appeals, however, held that compulsion is a threshold requirement to a finding of *Parker* immunity. It reached this conclusion by finding that: (i) *Midcal* is inapplicable to suits brought against private parties; (ii) even if *Midcal* is applicable, private conduct that is not compelled cannot be taken pursuant to a "clearly articulated state policy," within the meaning of *Midcal's* first prong; and (iii) because *Goldfarb* was cited with approval in *Midcal*, the *Midcal* Court endorsed the continued validity of a "compulsion requirement." We consider these points in order.

### A

The Court of Appeals held that *Midcal*, that involved a suit against a state agency, is inapplicable where a private party is the named defendant. *Midcal*, however, should not be given such a narrow reading. In that case we were concerned, as we are here, with state regulation restraining competition among private parties. Therefore, the two-pronged test set forth in *Midcal* should be used to determine whether the private rate bureaus' collective ratemaking activities are protected from the federal antitrust laws. The success of an antitrust action should depend upon the nature of the activity challenged, rather than on the identity of the

_____

(1963). In this context, if the federal courts wrongly conclude that an antitrust exemption is "unnecessary," Congress can correct the error. As the dissent recognizes, however, the Supremacy Clause would prevent state legislatures from taking similar remedial action. *Post*, at 67. Moreover, the proposed test would prompt the "kind of interference with state sovereignty . . . that . . . *Parker* was intended to prevent." 1 P. Areeda & D. Turner, Antitrust Law ¶ 214, p. 88 (1978). Therefore, we hold that state action immunity is not dependent on a finding that an exemption from the federal antitrust laws is "necessary."

defendant. See *Cantor* v. *Detroit Edison Co., supra,* at 604 (BURGER, C. J., concurring in part and concurring in judgment); *Lafayette* v. *Louisiana Power & Light Co., supra,* at 420 (BURGER, C. J., concurring in part and concurring in judgment).

B

The Court of Appeals held that even if *Midcal* were applicable here, the rate bureaus would not be immune from federal antitrust liability. According to that court, the actions of a private party cannot be attributed to a clearly articulated state policy, within the meaning of the *Midcal* test's first prong, "when it is left to the private party to carry out that policy or not as he sees fit." 702 F. 2d, at 539. In the four States in which petitioners operate, all common carriers are free to submit proposals individually. The court therefore reasoned that the States' policies are neutral with respect to collective ratemaking, and that these policies will not be frustrated if the federal antitrust laws are construed to require individual submissions.

In reaching its conclusion, the Court of Appeals assumed that if anticompetitive activity is not compelled, the State can have no interest in whether private parties engage in that conduct. This type of analysis ignores the manner in which the States in this case clearly have intended their permissive policies to work. Most common carriers probably will engage in collective ratemaking, as that will allow them to share the cost of preparing rate proposals. If the joint rates are viewed as too high, however, carriers individually may submit lower proposed rates to the Commission in order to obtain a larger share of the market. Thus, through the self-interested actions of private common carriers, the States may achieve the desired balance between the efficiency of collective ratemaking and the competition fostered by individual submissions. Construing the Sherman Act to prohibit collective rate proposals eliminates the free choice necessary to ensure that these policies function in the manner intended

by the States. The federal antitrust laws do not forbid the States to adopt policies that permit, but do not compel, anticompetitive conduct by *regulated* private parties. As long as the State clearly articulates its intent to adopt a permissive policy, the first prong of the *Midcal* test is satisfied.[22]

## C

In *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975), this Court said that "[t]he threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as sovereign." *Id.*, at 790. *Midcal* cited *Goldfarb* with approval. 445 U. S., at 104. On the basis of this citation, the Court of Appeals reasoned that *Midcal* did not eliminate the "compulsion requirement" of *Goldfarb*.

*Goldfarb*, however, is not properly read as making compulsion a *sine qua non* to state action immunity. In that case, the Virginia State Bar, a state agency, compelled Fairfax County lawyers to adhere to a minimum-fee schedule. 421 U. S., at 776–778. The *Goldfarb* Court therefore was not concerned with the necessity of compulsion—its presence in the case was not an issue. The focal point of the *Goldfarb* opinion was the *source* of the anticompetitive policy, rather than whether the challenged conduct was *compelled*. The Court held that a State Bar, *acting alone*, could not immunize its anticompetitive conduct. Instead, the Court held that private parties were entitled to *Parker* immunity only if the State "acting as sovereign" intended to displace competition. 421 U. S., at 790; see *Lafayette* v. *Louisiana Power*

---

[22] Under the Interstate Commerce Act, motor common carriers are permitted, but not compelled, to engage in collective *interstate* ratemaking. 49 U. S. C. §§ 10706(b)(2) and 10706(d)(2)(C). It is clear, therefore, that Congress has recognized the advantages of a permissive policy. We think it unlikely that Congress intended to prevent the States from adopting virtually identical policies at the intrastate level.

& *Light Co.*, 435 U. S., at 410 (opinion of BRENNAN, J.) ("*Goldfarb* . . . made it clear that, for purposes of the *Parker* doctrine, not every act of a state agency is that of the State as sovereign").

Although *Goldfarb* did employ language of compulsion, it is beyond dispute that the Court would have reached the same result had it applied the two-pronged test later set forth in *Midcal*. As stated above, Virginia "as sovereign" did not have a "clearly articulated policy" designed to displace price competition among lawyers. In fact, the Supreme Court of Virginia had explicitly directed lawyers not "to be controlled" by minimum-fee schedules. *Goldfarb*, *supra*, at 789, n. 19. Although we recognize that the language in *Goldfarb* is not without ambiguity, we do not read that opinion as making compulsion a prerequisite to a finding of state action immunity.

## D

The *Parker* doctrine represents an attempt to resolve conflicts that may arise between principles of federalism and the goal of the antitrust laws, unfettered competition in the marketplace. A compulsion requirement is inconsistent with both values. It reduces the range of regulatory alternatives available to the State. At the same time, insofar as it encourages States to require, rather than merely permit, anticompetitive conduct, a compulsion requirement may result in *greater* restraints on trade. We do not believe that Congress intended to resolve conflicts between two competing interests by impairing both more than necessary.

In summary, we hold *Midcal*'s two-pronged test applicable to private parties' claims of state action immunity. Moreover, a state policy that expressly *permits*, but does not compel, anticompetitive conduct may be "clearly articulated" within the meaning of *Midcal*.[23] Our holding today does not

---

[23] Contrary to the Government's arguments, our holding here does not suggest that a State may "give immunity to those who violate the Sherman Act by authorizing them to violate it." *Parker* v. *Brown*, 317 U. S., at

suggest, however, that compulsion is irrelevant. To the contrary, compulsion often is the best evidence that the State has a clearly articulated and affirmatively expressed policy to displace competition. See *Hallie* v. *Eau Claire, ante,* at 45–46; 1 P. Areeda & D. Turner, Antitrust Law ¶ 212.5, p. 62 (Supp. 1982) (compulsion is "powerful evidence" of existence of state policy). Nevertheless, when other evidence conclusively shows that a State intends to adopt a permissive policy, the absence of compulsion should not prove fatal to a claim of *Parker* immunity.

## IV

### A

Our holding that there is no inflexible "compulsion requirement" does not suggest necessarily that petitioners' collective ratemaking activities are shielded from the federal antitrust laws. A private party may claim state action immunity only if both prongs of the *Midcal* test are satisfied. Here the Court of Appeals found, and the Government concedes, that the State Public Service Commissions actively supervise the collective ratemaking activities of the rate bureaus. Therefore, the only issue left to resolve is whether the petitioners' challenged conduct was taken pursuant to a clearly articulated state policy.

The Public Service Commissions in North Carolina, Georgia, Mississippi, and Tennessee permit collective ratemaking. See n. 4, *supra.* Acting alone, however, these agencies

---

351; see *Schwegmann Bros.* v. *Calvert Distillers Corp.,* 341 U. S. 384 (1951). A clearly articulated *permissive* policy will satisfy the first prong of the *Midcal* test. The second prong, however, prevents States from "casting . . . a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Midcal,* 445 U. S., at 106. This active supervision requirement ensures that a State's actions will immunize the anticompetitive conduct of private parties only when the "state has demonstrated its commitment to a program through its exercise of regulatory oversight." See 1 P. Areeda & D. Turner, Antitrust Law § 213a, p. 73 (1978).

could not immunize private anticompetitive conduct. In *Goldfarb*, the State Bar—a special type of "state agency"—prohibited lawyers from charging fees lower than those set forth in schedules published by the local bar. Nevertheless, this Court held that the local lawyers were not immune from antitrust liability because their anticompetitive conduct was not required by the State as sovereign. 421 U. S., at 790. *Parker* immunity is available only when the challenged activity is undertaken pursuant to a clearly articulated policy of the State itself, such as a policy approved by a state legislature, see *New Motor Vehicle Bd. of Cal.* v. *Orrin W. Fox Co.*, 439 U. S. 96 (1978), or a State Supreme Court, *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977).

In this case, therefore, the petitioners are entitled to *Parker* immunity only if collective ratemaking is clearly sanctioned by the legislatures of the four States in which the rate bureaus operate. North Carolina, Georgia, and Tennessee have statutes that explicitly permit collective ratemaking by common carriers.[24] The rate bureaus' challenged actions, at least in these States, are taken pursuant to an express and clearly articulated state policy. Mississippi's legislature, however, has not specifically addressed collective ratemaking. We therefore must consider whether, in the absence of a statute expressly permitting the challenged conduct, the first prong of the *Midcal* test can be satisfied.

## B

The Mississippi Motor Carrier Regulatory Law of 1938, Miss. Code Ann. § 77–7–1 *et seq.* (1972 and Supp. 1984), gives the State Public Service Commission authority to regulate common carriers. The statute provides that the Commission is to prescribe "just and reasonable" rates for the intrastate transportation of general commodities. § 77–7–221. The legislature thus made clear its intent that intrastate rates

---

[24] N. C. Gen. Stat. § 62–152.1(b) (1982); Ga. Code Ann. § 46–7–18 (1982 and Supp. 1984); Tenn. Code Ann. § 65–15–119 (1982).

would be determined by a regulatory agency, rather than by the market. The details of the inherently anticompetitive rate-setting process, however, are left to the agency's discretion. The State Commission has exercised its discretion by actively encouraging collective ratemaking among common carriers. See Response of the State of Mississippi and the Mississippi Public Service Comm'n as *Amici Curiae* in District Court, No. 76–1909A (ND Ga. 1977), p. 11. We do not believe that the actions petitioners took pursuant to this regulatory program should be deprived of *Parker* immunity.

A private party acting pursuant to an anticompetitive regulatory program need not "point to a specific, detailed legislative authorization" for its challenged conduct. *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S., at 415 (opinion of BRENNAN, J.). As long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the *Midcal* test is satisfied. In *Goldfarb*, the Court held that *Parker* immunity was unavailable only because the State *as sovereign* did not intend to do away with competition among lawyers. 421 U. S., at 790. Similarly, in *Cantor* the anticompetitive acts of a private utility were held unprotected because the Michigan Legislature had indicated no intention to displace competition in the relevant market. 428 U. S., at 584–585.

If more detail than a clear intent to displace competition were required of the legislature, States would find it difficult to implement through regulatory agencies their anticompetitive policies. Agencies are created because they are able to deal with problems unforeseeable to, or outside the competence of, the legislature. Requiring express authorization for every action that an agency might find necessary to effectuate state policy would diminish, if not destroy, its usefulness. Cf. *Hallie* v. *Eau Claire, ante*, at 44 (requiring explicit legislative authorization of anticompetitive activity would impose "detrimental side effects upon municipalities' local autonomy"). Therefore, we hold

that if the State's intent to establish an anticompetitive regulatory program is clear, as it is in Mississippi,[25] the State's failure to describe the implementation of its policy in detail will not subject the program to the restraints of the federal antitrust laws.

C

In summary, we hold that the petitioners' collective rate-making activity is immune from Sherman Act liability. This anticompetitive conduct is taken pursuant to a "clearly articulated state policy." The legislatures of North Carolina, Georgia, and Tennessee expressly permit motor common carriers to submit collective rate proposals to Public Service Commissions, which have the authority to accept, reject, or modify any recommendation. Mississippi, the fourth State in which the petitioners operate, has not expressly approved of collective ratemaking, but it has articulated clearly its intent to displace price competition among common carriers with a regulatory structure. Anticompetitive conduct taken pursuant to such a regulatory program satisfies the first

---

[25] The Mississippi statute stands in sharp contrast to the Colorado Home Rule Amendment, which we considered in *Community Communications Co.* v. *Boulder*, 455 U. S. 40 (1982). In *Boulder*, the State Constitution gave municipalities extensive powers of self-government. *Id.*, at 43–44. Pursuant to this authority, the city of Boulder prohibited a cable television company from expanding its operations. The Court held that because the Home Rule Amendment did not evidence an intent to displace competition in the cable television industry, *id.*, at 55, Boulder's anticompetitive ordinance was not enacted pursuant to a clearly articulated state policy. This holding was premised on the fact that Boulder, as a "home rule municipality," was authorized to elect free-market competition as an alternative to regulation. *Id.*, at 56.

In this case, on the other hand, the Mississippi Public Service Commission is not authorized to choose free-market competition. Instead, it is required to prescribe rates for motor common carriers on the basis of statutorily enumerated factors. Miss. Code Ann. § 77–7–221 (1972). These factors bear no discernible relationship to the prices that would be set by a perfectly efficient and unregulated market. Therefore, the Mississippi statute clearly indicates that the legislature intended to displace competition in the intrastate trucking industry with a regulatory program.

prong of the *Midcal* test. The second prong of the *Midcal* test likewise is met, for the Government has conceded that the relevant States, through their agencies, actively supervise the conduct of private parties.

## V

We conclude that the petitioners' collective ratemaking activities, although not compelled by the States, are immune from antitrust liability under the doctrine of *Parker* v. *Brown*. Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE WHITE joins, dissenting.

The term "price fixing" generally refers to a process by which competitors agree upon the prices that will prevail in the market for the goods or services they offer. Such behavior is not essential to every public program for regulating industry. In this case, for example, four Southern States have established programs for evaluating the reasonableness of rates that motor carriers propose to charge for intrastate transport, but the States do not require price fixing by motor carriers. They merely tolerate it.

Reasoning deductively from a dictum in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 105 (1980), the Court holds that Congress did not intend to prohibit price fixing by motor carrier rate bureaus—at least when such conduct is prompted, but not required, by a State Public Service Commission. The result is inconsistent with the language[1] and policies of the Sherman Act, and this Court's precedent. The Sherman Act only would interfere with the regulatory process if the States compelled price

---

[1] "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U. S. C. § 1.

fixing that is unlawful under federal law. In that situation, the regulated carriers would face conflicting obligations under state and federal law, and the success of the States' regulatory programs would be threatened. Except under those circumstances, immunity from the antitrust laws under the state-action doctrine is not available for private persons.[2]

## I

"Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike":[3] agreements and combinations tampering with competitive price structures are unlawful. State legislatures, whose powers are limited by the Supremacy Clause,[4] may not expressly modify the obligations of any person under this federal law. Only Congress, expressly or by implication, may authorize price fixing, and has done so in particular industries or compelling circumstances. Implied antitrust immunities, however, are disfavored,[5] and any exemptions

---

[2] Of course, public agencies like municipalities need only establish that their anticompetitive conduct is taken pursuant to a clearly articulated and affirmatively expressed state policy. *Hallie* v. *Eau Claire, ante,* at 46–47. The less stringent requirement reflects the presumption "that the municipality acts in the public interest." *Ante,* at 45; cf. *Affiliated Capital Corp.* v. *City of Houston,* 735 F. 2d 1555, 1571–1572 (CA5 1984) (en banc) (Higginbotham, J., concurring), cert. pending, No. 84–951.

[3] *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 222 (1940); see also *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, 785 (1975); *United States* v. *McKesson & Robbins, Inc.,* 351 U. S. 305, 309–310 (1956); *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131, 143 (1948).

[4] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U. S. Const., Art. VI, cl. 2.

[5] *E. g., National Gerimedical Hospital and Gerontology Center* v. *Blue Cross of Kansas City,* 452 U. S. 378, 388–389 (1981); *United States* v. *National Assn. of Securities Dealers, Inc.,* 422 U. S. 694, 719–720 (1975).

from the antitrust laws are to be strictly construed.[6] These "canon[s] of construction . . . reflec[t] the felt indispensable role of antitrust policy in the maintenance of a free economy." *United States* v. *Philadelphia National Bank*, 374 U. S. 321, 348 (1963).

Applying these principles, this Court has consistently embraced the view that "[r]egulated industries are not *per se* exempt from the Sherman Act." *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, 456 (1945). For many years prior to the enactment of the Sherman Act, state agencies regulated the business of insurance, but we rejected the view that these programs of public scrutiny supported "our reading into the Act an exemption" allowing insurance businesses to fix premium rates and agents' commissions. *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 559 (1944). In *South-Eastern Underwriters*, the Court tersely observed that "if exceptions are to be written into the Act, they must come from Congress, not this Court." *Id.*, at 561. Thereafter, in the McCarran-Ferguson Act of 1945, 59 Stat. 33, Congress decided, as a matter of policy, that the Sherman Act's prohibition of price fixing "shall [only] be applicable to the business of insurance to the extent that such business is not regulated by State Law." 15 U. S. C. § 1012(b).

Consistent with its treatment of the insurance business in *South-Eastern Underwriters*, this Court has repeatedly held that collusive price fixing by railroads is unlawful even though the end result is a reasonable charge approved by a public rate commission.[7] *Georgia* v. *Pennsylvania R. Co.*,

---

[6] *E. g., Group Life & Health Insurance Co.* v. *Royal Drug Co.*, 440 U. S. 205, 231 (1979); *Abbott Laboratories* v. *Portland Retail Druggists Assn., Inc.*, 425 U. S. 1, 11 (1976).

[7] "In [*Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156 (1922)], the suit was one for damages under the Sherman Act. The charge was that the defendant carriers had formed a rate bureau or committee to secure agreement in respect to freight rates among the constituent railroad companies which would otherwise be competing carriers. As we have seen, the Court held that damages could not be recovered. But Mr.

324 U. S., at 455–463.; *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 337–340 (1897). In the *Pennsylvania Railroad* case, the Court explained why this is so:

> "The fact that the rates which have been fixed may or may not be held unlawful by the [Interstate Commerce] Commission is immaterial to the issue before us. . . . [E]ven a combination to fix reasonable and non-discriminatory rates may be illegal. [*Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156, 161 (1922)]. The reason is that the Interstate Commerce Act does not provide remedies for the correction of all the abuses of rate-making which might constitute violations of the anti-trust laws. Thus a 'zone of reasonableness exists between maxima and minima within which a carrier is ordinarily free to adjust its charges for itself.' *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 506 [1935]. Within that zone the Commission lacks power to grant relief even though the rates are raised to the maxima by a conspiracy among carriers who employ

---

Justice Brandeis speaking for a unanimous Court stated that a conspiracy to fix rates might be illegal though the rates fixed were reasonable and nondiscriminatory. He said . . . : 'All the rates fixed were reasonable and non-discriminatory. That was settled by the proceedings before the Commission. . . . But under the Anti-Trust Act, a combination of carriers to fix reasonable and non-discriminatory rates may be illegal; and if so, the Government may have redress by criminal proceedings under § 3, by injunction under § 4, and by forfeiture under § 6. That was settled by *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290 [1897], and *United States* v. *Joint Traffic Association,* 171 U. S. 505 [1898]. The fact that these rates had been approved by the Commission would not, it seems, bar proceedings by the Government.' [260 U. S., at 161–162]." *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, 457–458 (1945). Although the Court in *Pennsylvania Railroad* was divided on the question whether Georgia could pursue its antitrust remedy by invoking this Court's original jurisdiction, the dissenting Justices recognized that the United States could obtain an injunction against the alleged price fixing in an appropriate forum. See *id.,* at 484, 489 (Stone, C. J., dissenting). It is, of course, the United States that seeks relief in the case now before us.

unlawful tactics. . . . Damage must be presumed to flow from a conspiracy to manipulate rates within that zone." 324 U. S., at 460–461.

Collusive price fixing by regulated carriers causes upward pressure on rates within the zone of reasonableness, and such combinations and conspiracies are generally actionable under the Sherman Act on the theory of the *Pennsylvania Railroad* case.

Congress reacted to the *Pennsylvania Railroad* decision much as it reacted to the *South-Eastern Underwriters* decision. It decided, as a matter of policy, that some price fixing should be permitted in the transportation industry, and enacted the Reed-Bulwinkle Act of 1948 to effectuate that policy choice.[8] In the Motor Carrier Act of 1980,[9] however, Congress sharply curtailed the availability of this antitrust exemption. Collective ratemaking is still permitted in limited circumstances, but rate bureaus must comply with strict procedural requirements. See n. 19, *infra.*

The defendants have stipulated that their price-fixing arrangements are identical to those followed by the Carrier Rate Committees in the *Pennsylvania Railroad* case which were declared unlawful under the Sherman Act. See App. 40–41. They also acknowledge that neither the Reed-Bulwinkle Act nor any other federal statute expressly exempts their price fixing from the antitrust laws. Nevertheless, they contend that Congress would not have intended to prohibit collective ratemaking by intrastate motor carriers when it is permitted, but not required, by state law.

---

[8] "Parties to any agreement approved by the Commission under this section and other persons are . . . hereby relieved from the operation of the antitrust laws with respect to the making of such agreement, and with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission." 62 Stat. 473. The current version of the exemption is codified at 49 U. S. C. § 10706(b)(2).

[9] 94 Stat. 803, 49 U. S. C. §§ 10706(b)(3)(B)–(D).

## II

The basis for the defendants' claim of implied immunity from the antitrust laws is the state-action doctrine of *Parker* v. *Brown*, 317 U. S. 341 (1943). This Court, however, has repeatedly recognized that private entities may not claim the state-action immunity unless their unlawful conduct is compelled by the State.

In the *Parker* case, this Court held that the Sherman Act does not reach "state action or official action directed by a state." *Id.*, at 351. The case involved price fixing that was mandated by a California statute in the furtherance of a price-support program for raisin farmers. The Court held that the price fixing was not prohibited by the Sherman Act:

> "[T]he prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature." *Id.*, at 350–351.

Under *Parker*, private anticompetitive conduct must be "directed" by the State to be eligible for the state-action immunity.

In a later case involving price fixing by attorneys through minimum-fee schedules, the Court unanimously stated: "The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as sovereign. *Parker* v. *Brown*, 317 U. S., at 350–352; *Continental Co.* v. *Union Carbide*, 370 U. S. 690, 706–707 (1962)." *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 790 (1975). In *Goldfarb*, no state statute or Supreme Court rule required the defendant County Bar Association to

adopt the minimum-fee schedule, and this Court concluded that this "is not state action for Sherman Act purposes. It is not enough that, as the County Bar puts it, anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." *Id.*, at 791.

In *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579 (1976), the Court was also unanimous in its understanding that sovereign compulsion was a prerequisite for state-action immunity.[10] The opinion for the Court observed that it has long been settled "that state authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity." *Id.*, at 592–593 (footnotes omitted).[11] The dissenting Justices agreed: "private conduct, if it is to come within the state-action exemption, must be not merely 'prompted' but 'compelled' by state action." *Id.*, at 637 (Stewart, J., dissenting, joined by POWELL and REHNQUIST, JJ.).

In *Cantor*, the Court only divided on the question whether the compulsion requirement *alone* was sufficient to confer antitrust immunity. The dissent argued that Congress would not have intended to penalize Detroit Edison for engaging in a light-bulb-distribution program that had been approved by the Michigan Public Service Commission and that could not be discontinued without approval of the Commission. *Id.*, at 614–615. The Court, on the other hand, acknowledged that continuation of the light-bulb program was ostensibly required by the State, but went on to consider

---

[10] See, *e. g., Cantor* v. *Detroit Edison Co.*, 428 U. S., at 609 (BLACKMUN, J., concurring in judgment).

[11] For the proposition stated, the Court relied on *Goldfarb* v. *Virginia State Bar*, 421 U. S., at 791; *Continental Co.* v. *Union Carbide*, 370 U. S. 690, 706–707 (1962); *Parker* v. *Brown*, 317 U. S. 341, 351 (1943); *Union Pacific R. Co.* v. *United States*, 313 U. S. 450, 467–468 (1941); and *Northern Securities Co.* v. *United States*, 193 U. S. 197, 346 (1904).

whether an antitrust exemption for this conduct was fundamental to the State's regulatory program. Since Michigan's statutes only expressed an interest in regulating the electricity market, and not the light-bulb market, the Court concluded that "[r]egardless of the outcome of this case, Michigan's interest in regulating its utilities' distribution of electricity will be almost entirely unimpaired." *Id.*, at 598. Because the State had not articulated any intention to regulate the light-bulb market, and the idea for the distribution program had come from the private utility, the State's requirement that the program continue was not sufficient to establish state-action immunity from the antitrust laws.

The Court's unanimous decision in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), signaled no departure from settled principles in this area. In discussing the principles of law applicable to state-action immunity, the Court quoted extensively from the language in *Parker* and *Goldfarb*[12] that recognized the compulsion requirement. In any case, it was quite clear in *Midcal* that the California statutes required the unlawful resale-price-maintenance activities. Thus, this Court had no occasion in that case to explore the contours of the compulsion requirement. The references, in the *Midcal* opinion, to "clearly articulated and affirmatively expressed" policies and "actively supervised" activities merely restated the standards to be applied in evaluating whether conduct ostensibly compelled by the State is entitled to the state-action immunity. These requirements *limited* the scope of the

---

[12] "Several recent decisions have applied *Parker*'s analysis. In *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975), the Court concluded that fee schedules enforced by a state bar association were not mandated by ethical standards established by the State Supreme Court. The fee schedules therefore were not immune from antitrust attack. 'It is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign.' *Id.*, at 791." 445 U. S., at 104.

state-action immunity for private entities; they did not expand the immunity to protect conduct that is merely prompted by the State.[13]

### III

Today the Court abandons the settled view that a private party is not entitled to state-action immunity unless the State compelled him to act in violation of federal law. Hereafter, a State may exempt price fixing from the federal antitrust laws if it clearly articulates its intention to supplant competition with regulation in the relevant market, and if it actively supervises the unlawful conduct by evaluating the reasonableness of the prices charged. The Court justifies this change in the law by finding it more consistent with "principles of federalism and the goal of the antitrust laws, unfettered competition in the marketplace." *Ante*, at 61. I believe these conclusions are unsound.

### Deference to State Regulatory Programs

The Court's reliance today on vague "principles of federalism" obscures our traditional disfavor for implied exemptions to the Sherman Act. We have only authorized exemptions from the Sherman Act for businesses regulated by federal law when "that exemption was necessary in order to make the regulatory Act work 'and even then only to the minimum extent necessary.'"[14] No lesser showing of repugnancy

---

[13] As in *Cantor*, the Court concluded in the *Midcal* case that the State's ostensible compulsion of the resale-price-maintenance program was not alone sufficient to confer state-action immunity. The State neither set the prices nor reviewed their reasonableness, nor did it monitor market conditions and evaluate the effectiveness of the program. Under those conditions, the "State simply authorizes price setting and enforces the prices set by private parties. . . . The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." 445 U. S., at 105–106.

[14] *Cantor* v. *Detroit Edison Co.*, 428 U. S., at 597 (quoting *Silver* v. *New York Stock Exchange*, 373 U. S. 341, 357 (1963)). In *United States* v. *National Assn. of Securities Dealers*, the Court pointed out that "[i]mplied

should be sufficient to justify an implied exemption based on a state regulatory program.

Any other view separates the state-action exemption from the reason for its existence. The program involved in the *Parker* case was designed to enhance the market price of raisins by regulating both output and price.[15] In other words, the state policy was one that replaced price competition with economic regulation. Price support programs like the one involved in *Parker* cannot possibly succeed if every individual producer is free to participate or not participate in the program at his option. In *Parker*, the challenged price fixing was the heart of California's support program for agriculture; without immunity from the Sherman Act, the State would have had to abandon the project.

In this case, the common denominator in the States' regulatory programs for motor carriers is their reservation of the power to evaluate the reasonableness of proposed rates and

---

antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between antitrust laws and the regulatory system. See, *e. g., United States* v. *Philadelphia National Bank*, 374 U. S., at 348; *United States* v. *Borden Co.*, 308 U. S. 188, 197–206 (1939)." 422 U. S., at 719–720; see also nn. 5, 6, *supra*. These cases are, of course, consistent with the "cardinal rule," applicable to legislation generally, that repeals by implication are not favored. *Posadas* v. *National City Bank*, 296 U. S. 497, 503. (1936).

[15] "The California Agricultural Prorate Act authorizes the establishment, through action of state officials, of programs for the marketing of agricultural commodities produced in the state, so as to restrict competition among the growers and maintain prices in the distribution of their commodities to packers. The declared purpose of the Act is to 'conserve the agricultural wealth of the State' and to 'prevent economic waste in the marketing of agricultural products' of the state." 317 U. S., at 346.

"The declared objective of the California Act is to prevent excessive supplies of agricultural commodities from 'adversely affecting' the market, and although the statute speaks in terms of 'economic stability' and 'agricultural waste' rather than of price, the evident purpose and effect of the regulation is to 'conserve agricultural wealth of the state' by raising and maintaining prices, but 'without permitting unreasonable profits to producers.'" *Id.*, at 355.

terms of carriage.[16]    In these programs, "no State requires that all rates among competing carriers for identical service be uniform, [and] no State requires, either by statute or regulation, or other express legislative or administrative mandate, that rates proposed by carriers be formulated by rate conferences."    467 F. Supp. 471, 477 (ND Ga. 1979). When, as here, state regulatory policies are permissive rather than mandatory, there is no necessary conflict between the antitrust laws and the regulatory systems; the regulated entity may comply with the edicts of each sovereign.    Indeed, it is almost meaningless to contemplate a "regulatory" policy that gives every regulated entity *carte blanche* to excuse itself from the consequences of the regulation.    Even a policy against speeding could not be enforced if every motorist could drive as fast as he chose.    When a State declares that a regulated entity need not follow a regulatory procedure, it as much as admits that this element is inconsequential to the ultimate success of the regulatory program.[17]

---

[16] See Ga. Code Ann. §§ 46–2–25(b), 46–7–18 (Supp. 1984); Miss. Code Ann. §§ 77–7–217, 77–7–221 (1972); N. C. Gen. Stat. §§ 62–134(b), 62–146, 62–147 (1982); Tenn. Code Ann. §§ 65–5–203, 65–15–119 (1982).

[17] By consolidating petitions for rate modifications, collective ratemaking arguably preserves the resources of the state regulatory Commissions and promotes simplicity and uniformity in the intrastate rate structure.    See App. 60–61, 83–84, 90–91.    Under the statutes governing the state regulatory programs, however, the carriers may, at any time, decline to participate in collective ratemaking, and deprive the States of these purported advantages.    *Ante,* at 51.    That being so, it is difficult for the States to argue that these facets of their regulatory systems are essential to the program's success.    Brief for State of Iowa et al. as *Amici Curiae* 6 ("The authorization of the price-fixing agreement, collective ratemaking, by the states serves no cognizable state interest").

The States also contend that the defendants provide a valuable information-gathering service for motor carriers.    App. 60–61, 84, 90.    The District Court's final judgment, however, would not have interfered with this function.    *Id.,* at 99 ("Each defendant may provide statistical and other economic data and advice to any carrier wishing to avail itself of defendants' expertise").

As I have noted, the Reed-Bulwinkle Act[18] authorizes collective ratemaking by interstate carriers under some circumstances. The Court doubts whether "Congress intended to prevent the States from adopting virtually identical policies at the intrastate level." *Ante,* at 60, n. 22. The Reed-Bulwinkle exemption, however, has been abolished for single-line rate requests, and to the extent that it still applies to general rate requests, the rate bureaus must follow stringent procedural safeguards which channel their conduct into useful informational tasks and thereby diminish the threat of anticompetitive misconduct.[19] Even if there were sound policy reasons[20] for extending the Reed-Bulwinkle exemp-

---

[18] See n. 8, *supra.*

[19] Under the exemption, as amended, the ratemaking conferences, among other things, must disclose the names of their members and affiliates of their members, 49 U. S. C. § 10706(b)(3)(A); the organization must limit discussion and voting to allowed subjects and parties, § 10706(b)(3)(B)(i); "the organization may not file a protest or complaint with the Commission against any tariff item published by or for the account of any motor carrier," § 10706(b)(3)(B)(iii); "the organization may not permit one of its employees or any employee committee to docket or act upon any proposal effecting a change in any tariff item," § 10706(b)(3)(B)(iv); "upon request, the organization must divulge to any person the name of the proponent of a rule or rate docketed with it, must admit any person to any meeting at which rates or rules will be discussed or voted upon, and must divulge to any person the vote cast by any member carrier on any proposal before the organization," § 10706(b)(3)(B)(v); and the organization shall make a final disposition of rate proposals within 120 days, § 10706(b)(3)(B)(vii). See generally *ICC* v. *American Trucking Assns., Inc.,* 467 U. S. 354 (1984).

[20] In the legislative history of the 1980 Motor Carrier Act, however, Congress suggested otherwise:

"During the course of its hearings, the Committee heard a good deal of criticism of the rate bureau process. . . . The disadvantage is that the system inherently tends to result in rates that will be compensatory for even the least efficient motor carrier participating in the rate discussions. When this happens, consumers lose the benefit of price competition that would occur if more efficient carriers were able to offer more attractive rates. Another serious problem has been the closed nature of the rate bureau proceedings. Voting upon specific rate proposals is done behind

tion, as amended, to a state regulatory program that did not contain comparable procedural safeguards, "[t]hese considerations are . . . not for us. . . . Congress is the body to amend [the statute] and not this court, by a process of judicial legislation wholly unjustifiable." *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S., at 340.

## *The Policy of Competition*

The Court embraces the defendants' specious argument that "insofar as it encourages States to require, rather than merely permit, anticompetitive conduct, a compulsion requirement may result in *greater* restraints on trade." *Ante*, at 61. The Court finds this "result" inconsistent with the policies of the Sherman Act. This argument is seriously flawed.

On a practical level, the Court's argument assumes that a decision for the Government today would cause the States to rush into enactment legislation compelling price fixing in the motor carrier industry. Moreover, the Court's argument assumes that a Congress that only recently has acted to increase competition in the interstate motor carrier field would remain silent in the face of anticompetitive legislation at the intrastate level. These assumptions are wholly speculative.

On a more theoretical level, the Court ignores the anticompetitive effect of the collective ratemaking practices challenged in *this* litigation.[21] The Court of Appeals correctly observed that "[c]ollective [rate] formulation clearly tampers with the price structure for intrastate commodities; the rate

---

closed doors." S. Rep. No. 96–641, p. 13 (1980). See also H. R. Rep. No. 96–1069, p. 27 (1980).

[21] "It has been held too often to require elaboration now that price fixing is contrary to the policy of competition underlying the Sherman Act and that its illegality does not depend on a showing of unreasonableness since it is conclusively presumed to be unreasonable." *United States* v. *McKesson & Robbins, Inc.*, 351 U. S., at 309–310.

bureau arrangement substitutes concerted pricing decisions among competing carriers for the influence of impersonal market forces on proposed rates." 672 F. 2d 469, 478 (CA5, Unit B, now CA11, 1982). The increased rates for transportation caused by this behavior are especially grave in a basic industry, like transportation, where the ripple effects of the increased rates are magnified as raw materials, semifinished and finished goods are transported at various stages of production and distribution.

Active supervision of the rate bureau process—like that provided in the Motor Carrier Act of 1980—might minimize the anticompetitive effects of collective ratemaking.[22] To the extent that the State Regulatory Commissions are structured like the ICC in the *Pennsylvania Railroad* case, however, they only have the power to reject the rates proposed by the carriers if those rates fall outside the "zone of reasonableness." Unless the Commissions "actively supervise" the price-fixing process itself, they cannot eliminate the upward pressure on rates caused by collusive ratemaking. Unfortunately, the nature of the "active supervision" of those carriers who take part in collective ratemaking is not fully disclosed by the record.[23]

IV

Whether it is wise or unwise policy for the Federal Government to seek to enforce the Sherman Act in this case is not a question that this Court is authorized to consider. The District Court and the Court of Appeals correctly applied established precedent in holding that the Government is en-

_____

[22] The Court of Appeals, however, found that the State Commissions' scrutiny of the reasonableness of proposed rates satisfies the active supervision requirement. 702 F. 2d 532, 539, n. 12 (CA5, Unit B, now CA11, 1983) (en banc).

[23] Some of the States' statutes and implementing regulations indicate that the process of collective ratemaking is being supervised on a limited basis. See, *e. g.*, N. C. Gen. Stat. § 62–152.1(c) (1982); Ga. Pub. Serv. Comm'n Rule 1–3–1–.14 (1983); Tenn. Pub. Serv. Comm'n Rule 1220–2–1–.40 (1974).

titled to an injunction against the defendants' price fixing. Such price fixing is unlawful unless it is expressly authorized by statute, or required by a State's regulatory program. Today the Court authorizes collective ratemaking by intrastate motor carriers even though the State has only permitted it in a program regulating the reasonableness of prices in the industry. Immunity of this type was rejected by the Court in the *South-Eastern Underwriters* and *Pennsylvania Railroad* cases, but today, under the shroud of the state-action doctrine,[24] it is resurrected.

Accordingly, I respectfully dissent.

---

[24] Since the Court does not reach it, *ante,* at 53, n. 11, 55, n. 17, I do not address the merits of the *Noerr-Pennington* question. See *Mine Workers* v. *Pennington,* 381 U. S. 657 (1965); *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127 (1961).