**UNITED STATES of America, Plaintiff,**

v.

**ROCHESTER GAS AND ELECTRIC CORPORATION, Defendant.**

No. 97–CV–6294T.

United States District Court,
W.D. New York.

Feb. 17, 1998.

Jade Alice Eaton, Rebekah J. French, Janet R. Urban, Nina Hale, Washington, DC, for U.S.

John Stuart Smith, David M. Schraver, Flor M. Colon, Nixon, Hargrave, Devans & Doyle LLP, Rochester, NY, for Rochester Gas & Electric Corp.

Rene Davison, Office of New York State Attorney General, New York State Dept. of Law, Rochester, NY, Richard L. Schwartz, Office of the Attorney General, New York City, for New York State, amicus.

## DECISION and ORDER

TELESCA, District Judge.

### INTRODUCTION

Plaintiff the United States of America brings this action against defendant Rochester Gas and Electric Corporation, ("RG & E"), pursuant to Section 1 of the Sherman Act, codified at 15 U.S.C. § 1, alleging that RG & E has engaged in anticompetitive acts. Specifically, plaintiff alleges that RG & E illegally engaged in anticompetitive activities by entering into a contract with the University of Rochester, ("University" or "U of R") whereby, *inter alia*, RG & E promised to provide electricity to the U of R at reduced rates in return for, *inter alia*, the University's promise not to compete against RG & E in the sale of electricity to consumers. Complaint at ¶ 15. According to the United States, RG & E entered into its agreement with the U of R for the purpose of preventing the University from constructing a competing power producing facility. The United States alleges that as a result of the agreement between the U of R and RG & E, the University discontinued its plans to produce a power generating facility, thereby preventing a potential competitor from entering the market. The Government contends that RG & E's actions in preventing a potential competitor from entering the market were harmful to consumers in that RG & E denied consumers an alternative source from which to buy electricity, and increased costs for other RG & E customers who were required to pay more for electricity to offset the discounts that were given to the U of R.

Defendant RG & E moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on grounds that it is immune from antitrust liability under the state action doctrine, and in the alternative, that it has not engaged in any anticompetitive behavior. The United States cross-moves for summary judgment claiming that RG & E is subject to antitrust liability, and that as a matter of law, defendant engaged in anticompetitive activity prohibited by the Sherman Act. Plaintiff also moves to strike portions of an affidavit submitted in support of defendant's motion for summary judgment.

The New York State Attorney General's office submits an amicus curiae brief contending that RG & E should not be immune from antitrust liability under the state action doctrine.

### BACKGROUND

The following facts are uncontested except where noted. Sometime in the late 1980's or early 1990's, in an effort to reduce energy costs, the University of Rochester began to consider generating its own power using a "cogeneration" facility. A cogeneration facility is a powerplant that burns fuel to produce two types of energy: electricity and steam. The U of R used electricity throughout its campus, and used steam to heat and cool its buildings.

In early 1993, University President Dennis O'Brien convened a special task group to study the feasibility of constructing and operating a cogeneration facility. After months of study, the task group determined that a cogeneration facility would be a viable source of energy for the University. The group concluded that a 23 megawatt plant would be required, and that the cost of such a plant

would be approximately $36 million. The task group determined that because the plant would generate more electricity than required by the University, approximately one-third of the electricity produced could be sold. According to the United States, the U of R considered selling this electricity to other consumers, including the Rochester Institute of Technology. RG & E contends that the University planed to sell the electricity back to RG & E.

On July 20, 1993, the Executive Committee of the Board of Trustees of the University of Rochester voted to authorize officers of the University to proceed with development of a 23 megawatt cogeneration facility, and allocated $1.3 million to initiate that development. Soon thereafter, RG & E approached the University with a proposal to sell electricity to the University at a discounted rate, and to provide other financial incentives that would negate any savings that would have been realized through the school's production of its own steam and electricity. The University negotiated the proposal with RG & E, and on October 27, 1993, the parties entered into a "Memorandum of Understanding," ("MOU"), which served as the basis for a contract which followed. The MOU explicitly acknowledged that the University had alternative sources of energy that might be available to it including "the installation of a cogeneration power plant...." Given those circumstances, the parties agreed that, *inter alia:* (1) the University would remain an RG & E customer until December 31, 2000; (2) the University would pay a specified discounted rate for electricity; (3) RG & E would make yearly grants to the University of at least $163,000 to be used by the school to pay for energy efficiency projects; (4) RG & E would continue to make yearly research and development grants to the University averaging $400,000 per year; (5) the University would enter into an contract with an RG & E sponsored contractor under which RG & E would fund energy efficiency projects recommended by the contractor; and, (6) the University would be allowed to continue to study alternative sources of energy, but the studies would be "confined to the service of the University's own needs." *See* Memorandum of Understanding, Attached as Exhibit 4

to Plaintiff's Statement of Uncontested Facts.

Based on the MOU, RG & E and the University entered into an Individual Service Agreement, ("ISA"), on March 31, 1994. Under the ISA, the University agreed to remain a customer of RG & E until December 31, 2000. Additionally, in return for: (1) reduced rates on electricity service; (2) an "inducement" payment to induce the University to forego other electric supply options; (3) payments to the University for implementing energy-saving projects; and (4) payments to the University for entering into a contract with an energy service company and implementing energy-saving projects recommended by the company, (guaranteed to be at least $1,743,000), the University agreed, during the term of the agreement, "not to solicit or join with other customers of RG & E to participate in any plan designed to provide them with electric power and/or thermal energy from any source other than RG & E." *See* Individual Service Agreement, attached as Exhibit 5 to Plaintiff's Statement of Uncontested Facts at ¶ 6.3.

## DISCUSSION

### I. *Motions for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, all inferences and ambiguities must be resolved in favor of the party against whom summary judgment is sought. *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1223 (2d Cir.1994). If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *Id.* at 1224.

Defendant moves for summary judgment on two grounds. First, defendant claims that it is immune from antitrust liability un-

der the state action doctrine, and therefore is entitled to judgment as a matter of law. Second, RG & E argues that even if it is not immune from antitrust liability, it can not be held liable under the Sherman Act because its actions did not violate antitrust law. The Government moves for summary judgment on grounds that the contract between RG & E and the U of R is a *per se* violation of the Sherman Act, in that it restrains trade by preventing a potential competitor from entering the market.

## II. *Defendant's Motion*

### A. *State Action Doctrine.*

Defendant argues that it is immune from antitrust liability under the state action doctrine as first espoused by the Supreme Court in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and as interpreted in *Southern Motor Carriers Rate Conference, Inc. v. U.S.,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). In *Southern,* the Supreme Court held that private companies could be held immune from liability under federal antitrust law if their allegedly anticompetitive conduct was authorized and regulated by the State. The Court held that:

> Conduct is exempt under the state action defense if two requirements are met. [F]irst, the State has articulated a clear and affirmative policy to allow the anticompetitive conduct, and second, the State provides active supervision of anticompetitive conduct undertaken by private actors.

*Southern,* 471 U.S. at 56, 57, 105 S.Ct. 1721. According to RG & E, because utility companies are authorized by New York State law to negotiate discounted rates with customers who are capable of obtaining electricity from other sources, (including other suppliers or self-generation), and because the discounting of rates is closely supervised by the New York Public Service Commission, RG & E should be held immune from antitrust liability under the state action doctrine. Plaintiff, and the New York State Attorney General, who appears as an *amicus curiae,* oppose defendant's contention that it is immune from antitrust liability under the state action doctrine.

While it is true that under New York law a utility company may negotiate discounted rates with certain qualified consumers, and that discounting rates is carefully supervised by the New York Public Service Commission to prevent abuse of such a practice, New York law does not authorize utility companies to offer discounted rates to potential competitors for the purpose of preventing those potential competitors from becoming actual competitors. Thus, while RG & E may be correct in arguing that the discounting of electricity rates under New York law does not violate federal antitrust laws, that conclusion does not end the inquiry. The United States contends that RG & E went too far in negotiating the discounted rate by imposing a condition in the agreement the provision that the University not compete with RG & E, nor solicit or join with RG & E customers to generate electricity. It is that aspect of the agreement that the United States claims is violative of federal antitrust law.

■ I find nothing in the New York Public Service Law or its legislative history supporting RG & E's contention that it is authorized under that law to impose anti-competitive conditions on potential competitors in return for discounted utility rates. New York Public Service Law § 66(12–b)(a) provides that the Public Service Commission may authorize reduced "incentive" rates that utilities may offer to customers "in order to prevent loss of such customers...." N.Y.Pub.Serv.Law § 66(12–b)(a) (McKinney, 1989) The legislative history of this Section indicates that the New York legislature was concerned with the loss of business and industry in New York State, and the "severe economic hardship and dislocation" that occurred as a result of that loss. 1983 N.Y.Laws 626. The legislature "determined that the cost of utility services can be a significant factor in retaining and attracting healthy businesses and employment opportunities...." 1983 N.Y.Laws 626. Accordingly, the legislature authorized the Public Service Commission to identify areas in New York where "reduced economic activity, unemployment and underutilization of utility facilities justifies the approval of reduced incentive rates for utility services...." N.Y.Pub.Serv.Law § 66(12–b)(a) (McKinney,

1989). Based on the language of the statute, and the legislative history, it is clear that New York Law does not expressly authorize utility companies to offer discounted rates to consumers who are also potential competitors for the purpose of inducing them not to compete against the utility.

RG & E contends, however, that the contract with the University prohibiting competition was a foreseeable result of the State's policy of allowing discounted rates, and accordingly, it is implicitly authorized under the Public Service Law. *See Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.,* 790 F.2d 1032, 1043 (2d Cir. 1986) (anticompetitive activities that are a foreseeable consequence of state delegation satisfy the Southern requirement that the state articulate a clear and affirmative policy to allow anti-competitive conduct). According to RG & E, such a contract was foreseeable because, "if the University were permitted to participate in a plan [to purchase electricity from an alternative source] with other RG & E customers that would result in the loss of those other customers, the goal of the flexible rate tariff [maintaining the utilities' full system capacity] would have been thwarted." Memorandum of Law in Support of Motion for Summary Judgment at p. 16.

I find that the New York Public Service Law does not permit a utility to offer discounts to a potential competitor in return for that competitor's promise not to compete. Despite RG & E's contention that the goal of the State's policy is to maintain full capacity of utilities, I find that the goal of the State's policy of offering lower utility rates is to reduce utility costs and retain or attract businesses based on those lower utility costs. Competition from "cogenerators" in the sale of electricity is consistent with that goal: it lowers the utility costs of the cogenerator, and keeps the cogenerator in the area. Moreover, because cogenerators are in most cases exempt from the State rate regulations imposed on utility companies, cogenerators may under certain circumstances, sell their excess electricity directly to consumers at a reduced rate, thus giving consumers a choice between electric providers. Accordingly, I find that the State's policy of allowing discounted rates does not implicitly authorize anticompetitive actions on the part of Utilities seeking to prevent potential competitors from entering the market.

■ Finally, RG & E argues that its contract, and the allegedly anticompetitive provisions contained therein, are authorized under State law on grounds that the Public Service Commission has rigorously reviewed the contract, and has found it to be not only acceptable under New York State Law, but a model for agreements offering rate reductions. The Public Service Commission, however, is not charged with enforcing federal antitrust law, and did not review the contract to determine whether or not it violates that law. The fact that the New York Public Service Commission has approved the contract at issue does not mean that the State has authorized, and shielded from federal law, allegedly anticompetitive behavior. I thus deny defendant's motion for summary judgment on grounds that it is immune from antitrust liability.

### B. *Alleged Antitrust Activity.*

■ Defendant argues in the alternative that even if it is not shielded from antitrust liability, the conduct it engaged in was not anticompetitive as a matter of law and it is entitled to summary judgment. RG & E makes two arguments in support of this claim. First, it contends that because the University was neither a competitor, nor a potential competitor in the electricity market, an agreement between the two not to compete can not violate the Sherman Act. *See TV Communications Network, Inc. v. ESPN, Inc.,* 767 F.Supp. 1062, 1075 (D.Col.1991) (agreement between non-competitors does not violate § 1 of the Sherman Act); *aff'd* 964 F.2d 1022 (10th Cir.1992); *cert. denied,* 506 U.S. 999, 113 S.Ct. 601, 121 L.Ed.2d 537 (1992). Second, RG & E argues that the Government's claims against RG & E are based on unwarranted speculation about the University's ability to become a *bona fide* competitor. I find that a question of fact exists as to whether or not the University intended to compete against RG & E, and therefore, deny defendant's motion for summary judgment.

In support of its argument that the University did not intend to compete with RG & E, defendant submits an affidavit from Richard W. Greene, ("Greene"), Executive Vice President and Treasurer of the University of Rochester. Greene states that at the time the University negotiated the contract with RG & E, it had no intention to sell energy to RG & E customers. Greene affidavit at ¶ 17. However, Green also admitted that the University considered competing directly with RG & E by selling output from the proposed cogeneration plant, but that "to the best of [his] knowledge," no plan to sell electricity to other facilities was adopted. Greene affidavit at ¶ 15. Additionally, William Daigneau, ("Daigneau"), who at the relevant time was the Director of University Facilities, stated that the University had considered building "a [cogeneration] plant that would be located on our south campus that would provide much more power than what we could consume individually ... which could be wheeled or perhaps used by other institutions." Deposition of William A. Daigneau at pp 35–6. Additionally, Daigneau could not recall whether or not the University engaged in discussions with other institutions regarding the possibility of building a cogeneration plant. It is thus uncontroverted that at least at some point during the University's planing, it considered becoming a competitor of RG & E. Greene's contention that to the "best of his knowledge" the University never seriously pursued selling to outside sources, and Daigneau's failure to recall whether discussions took place with potential consumers of University-supplied power at least makes it unclear whether or not the University was a potential competitor. Thus, the important question of whether or not the U of R was a potential competitor of the University is a question of fact for the trier of fact.

Next, RG & E argues that the Government's characterization of the U of R as a potential competitor of RG & E is too attenuated, and therefore, its theory of recovery against RG & E is too speculative to go forward. According to RG & E, even if the University had intended to compete with RG & E, actually doing so was fraught with legal and regulatory obstacles that could have prevented it from entering the market despite its intent to do so. For example, RG & E points out that if the U or R had attempted to sell electric power, it would have had to first obtain approval from the Public Service Commission, and then it would have been subject to the Commission's regulatory control, (unless it came under a narrow exception applicable to certain cogeneration facilities). Also, if the University were to sell electricity to the Rochester Institute of Technology, it would have had to apply for and have had approved franchises from the City of Rochester and the towns of Brighton and Henrietta to deliver the electricity. RG & E claims that because the Government has failed to demonstrate that the University could have actually competed with it, the plaintiff's claim is too speculative, and must be dismissed.

I find that while the Government's theory that the University intended to compete with RG & E is based on some speculation, the question of whether or not the University actually intended to compete with RG & E is a question of fact, that must be resolved by a trier of fact and summary judgment must be denied.

III. *Plaintiff's Motion for Summary Judgment.*

 Plaintiff asserts that the agreement between the defendant and the University not to compete is a *per se* violation of antitrust law. However, a contract between non-competitors to not compete does not violate the antitrust laws. *TV Communications Network, Inc.,* 767 F.Supp. at 1075; *cert. denied,* 506 U.S. 999, 113 S.Ct. 601, 121 L.Ed.2d 537 (1992). Because there is a question of fact as to whether or not the University was a potential competitor of RG & E, I can not hold that as a matter of law this agreement is evidence of a *per se* violation of the antitrust laws and, therefore, plaintiff's motion for summary judgment is also denied.

IV. *Plaintiff's Motion to Strike.*

Plaintiff moves to strike portions of an affidavit of Thomas Fogg, Manager of Regulatory Affairs for RG & E during the relevant time period, as not based on personal

**178**

knowledge, and because they contain legal arguments. I deny plaintiff's motion to strike.

### CONCLUSION

Because a material, triable issue of fact exists as to whether or not the University of Rochester was a *bona fide* potential competitor of the defendant, I deny both parties' motions for summary judgment. Additionally, I deny plaintiff's motion to strike. This case will proceed to a bench trial on April 27, 1998 at 9:00 a.m. Pretrial submissions shall be submitted to the Court no later than April 22, 1998 by 12:00 p.m.

ALL OF THE ABOVE IS SO OR-DERED.