USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1385 MARUHO COMPANY, LTD., Plaintiff, Appellant, v. MILES, INC., Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Aldrich, Senior Circuit Judge, ____________________ and McAuliffe,* District Judge. ______________ ____________________ Alan R. Hoffman with whom John R. Cavanaugh and Lynch, Brewer, ________________ _________________ _______________ Hoffman & Sands were on brief for appellant. _______________ Sydelle Pittas with whom Powers & Hall, P.C. was on brief for ______________ ____________________ appellee. ____________________ December 29, 1993 ____________________ ______________________ *Of the District of New Hampshire, sitting by designation. BREYER, Chief Judge. Miles, Inc., invented and ____________ patented a pain-killing drug called Xorphanol. In 1984, Miles gave Pars Pharmaceutical Co. the exclusive right throughout the world to make, have made, use and sell Xorphanol, in return for which Pars promised to pay a royalty and to use reasonable efforts directly or through its subcontractors to develop one or more compounds . . . to the point of [obtaining] . . . government . . . approval for . . . [Xorphanol's] therapeutic use . . . . In 1988, Pars sublicensed the plaintiff in this lawsuit, Maruho, Inc., to develop Xorphanol "compounds" and to sell them in Japan. According to Maruho, Pars misled it during the sublicense negotiations. Although Maruho asked Pars to produce all relevant studies, Pars did not tell it about 1) an important negative study conducted by the Charterhouse Research Unit of a well-known British pharmaceutical firm, Glaxo, Inc., and 2) a less important negative study conducted by the Director of the Stanford Pain Clinic. Both of these studies indicated that Xorphanol, while effectively reducing pain, also caused adverse side effects, such as headaches, drowsiness, dizziness, and euphoria. Maruho says -2- 2 that, had it seen these studies, it would not have bought the sublicense. In its view, Pars is guilty of fraud. Maruho, however, seems unlikely to get its money back from Pars, for Pars is in the midst of bankruptcy proceedings. Maruho instead seeks recovery from Miles, Xorphanol's original licensor; and, in this (diversity- based) lawsuit against Miles, it pleads various theories of state law. The district court, after examining the evidence proffered by the parties, granted summary judgment for Miles. Maruho appeals. We affirm the district court's judgment. I Maruho's Procedural Argument ____________________________ At the outset, Maruho raises a procedural point. It says that the district court improperly converted a motion by Miles for judgment on the pleadings, Fed. R. Civ. P. 12(b)(6), into a motion for summary judgment, Fed. R. Civ. P. 56, without giving Maruho a "reasonable opportunity" to present "pertinent material." See Fed. R. Civ. P. 12(b) ___ (court shall treat motion for judgment on pleadings as a motion for summary judgment where "matters outside the pleading" are presented to and accepted by the court and -3- 3 "reasonable opportunity" to present "pertinent material" is "given"). The record, however, does not support Maruho's claim. Miles' motion gave Maruho adequate notice of the risk of summary judgment, for Miles entitled it "Motion to Dismiss or, in the Alternative, for Summary Judgment" _____________________________________________ (emphasis added). We concede that Maruho immediately told the court that it thought Miles' motion requested summary judgment on only one count. But Maruho also told the court, ___ in writing at the same time, that it would assume "that all ___ of Miles' contentions are asserted under both Fed. R. Civ. P. 12 and [summary judgment rule] 56" (emphasis in original). Maruho then presented to the court three volumes of documents, which it titled "Plaintiff Summary Judgment Record." In response to questioning by this court at oral argument, Maruho could not identify any piece of evidence that it had lacked the opportunity to submit. Given these circumstances, Maruho converted Miles' motion into a motion ______ for summary judgment on all counts by presenting pertinent material outside the pleadings; and Maruho not only had, but also took advantage of, a "reasonable opportunity" to present all "pertinent" material. See In re G.& A. Books, ___ ____________________ Inc., 770 F.2d 288, 294-95 (2d Cir. 1985), cert. denied, 475 ____ ____________ -4- 4 U.S. 1015 (1986). The district court was therefore legally entitled to treat Miles' motion as one for summary judgment on all counts. II Miles' Participation in the Fraud _________________________________ Maruho argues that Miles is liable as an actual participant in Pars' fraud, either by "aiding and abetting" Pars' fraud, by acting "in concert" with Pars, or by engaging in an "unfair or deceptive act or practice." See ___ Mass. Gen. L. ch. 95, 11; Kyte v. Philip Morris, Inc., 556 ____ ___________________ N.E.2d 1025 (Mass. 1990); Restatement (Second) of Torts ______________________________ 876(a), (b) (1979) [hereinafter "Restatement (2d)"]. It _________________ says that, in the circumstances, a showing that Miles either 1) actually knew about the fraud, or 2) should have known ______________ __________________ about the fraud, is sufficient to trigger Miles' liability as an actual participant. We shall consider, in turn, each of the two branches of Maruho's argument. 1. Actual knowledge. We shall assume, for __________________ argument's sake, that a finding that Miles actually knew about Pars' fraud would trigger Miles' liability. Nonetheless, like the district court, we do not believe the record would permit a reasonable juror to make that factual finding. -5- 5 Maruho says that a juror might find Miles' "actual knowledge" by inferring, from Miles' conceded knowledge that Maruho was willing to pay $3 million for the sublicense, that Miles must have known that Pars hid the negative Xorphanol studies from Maruho. Otherwise, why would Maruho pay so much for so little? To make the inference, however, requires some kind of propositional link, such as, "a knowledgeable firm would likely not have paid $3 million had it known about the studies." The problem for Maruho is that this link is missing. We agree with Maruho that a reasonable juror could believe that Miles knew the following: a. After obtaining its license in 1984, Pars sublicensed Glaxo, Inc., a highly reputable British firm, to prepare Xorphanol for marketing. In 1986, Glaxo, after paying Pars more than $1.5 million for the sublicense, terminated the agreement. b. Glaxo cancelled the sublicensing agreement after its Charterhouse Research Unit tested Xorphanol by giving ten volunteers single doses (each in an amount growing from 0.25 mg to 4.0 mg over the course of several days). The Charterhouse study showed that many of these volunteers suffered some significant adverse side effect not suffered when they took a placebo. c. Earlier, in 1985, the Director of Stanford Pain Clinic had conducted a multidose study of Xorphanol, giving volunteers several doses of 2 mg and 4 mg over several days. More of these volunteers suffered some significant -6- 6 adverse side effect than those who received comparable doses of codeine, a commonly used pain killer. d. After Glaxo's 1986 termination, Maruho, in mid-1987, agreed to pay Pars $3 million for Japanese sublicensing rights. The record, however, also shows the following facts, which are not significantly disputed: a. Xorphanol was potentially a very valuable product. The market for pain killers amounts to several billion dollars annually. Xorphanol seemed to have the pain killing properties of a narcotic, such as codeine, without any addictive quality. Financial newspapers spoke initially of expected "annual worldwide" Xorphanol "sales of at least $50-100 million." b. Miles, after receiving "updated IND information on Xorphanol," (which Maruho says included the Stanford, as well as the Charterhouse, studies), wrote Pars a letter in which it basically accepted the fact that the Charterhouse study was negative, but nonetheless pointed to other, positive, studies; urged Pars to perform further studies; noted the large sales of combination and other pain killers; and concluded, in reference to Xorphanol, that "there is still a place for a moderate to strong, orally active, non-dependence producing" pain killer. c. Other studies in the record show Xorphanol as having highly desirable pain-killing effects, with the frequency of side effects depending upon the study and the dose. The studies all make clear that codeine and other pain killers also have side effects, and that, since many of the side effects are subjective, placebos have them as well. -7- 7 d. The experts differed about the significance ________ of the Charterhouse study, with at least one prominent expert finding that it was not critically important and did not warrant abandoning the Xorphanol project. Dr. Louis Lasagna, the Dean of Tufts University School of Graduate Biomedical Sciences, examined the Charterhouse study and concluded that: 1) "[T]here is nothing in the Charterhouse data that is disturbing about the 0.25 and 0.5 mg doses, and even at the 1.0 and 2.0 mg doses, there is no reason for excessive anxiety about adverse effects, if one compares the results on active drug with the results with placebo." 2) "There is nothing in this report, in my opinion, that would call for a halt to clinical testing of Xorphanol at doses up to (and including) 2 mg." 3) "In my view it is premature to make a judgment as to the clinical utility and safety of this drug in the absence of more clinical trial data." The upshot is a record that, even when viewed in Maruho's favor, shows (1) a product potentially worth a great deal of money; (2) Miles' belief, after learning of the negative studies, that Xorphanol was still valuable; (3) experts (at Glaxo) who thought that Xorphanol was not worth developing; but (4) a respected expert who thought that Xorphanol was still worth developing. Had Maruho presented -8- 8 favorable expert testimony on the relevant question -- whether the hidden studies were conclusive to the point that a reasonable pharmaceutical executive would have thought Xorphanol had little or no value --- the jury might have had a basis for reaching a favorable conclusion about what Miles knew. But Maruho presented no such expert testimony. And, our lay reading of the record, including the relevant studies, leads inexorably to the conclusion that experts differed in their views about Xorphanol's value, with Miles indisputedly arguing for further development. That fact, in turn, means that Miles need not have concluded, from the $3 million payment, that Pars must have hidden the studies. And, a reasonable jury could not conclude that Miles in fact __ ____ knew about Pars' misconduct. 2. "Should have known." Maruho argues that Miles _________________ is liable as long as it "should have known" about Pars' fraud. The record, however, even when interpreted favorably to Maruho, supports the factual part of this claim only to the point where a reasonable juror might find that Miles should have been suspicious -- and no further. And, that factual finding does not provide sufficient basis for a legal finding that Miles is liable as an actual participant in the fraud. -9- 9 First, insofar as Maruho's "actual participant" theories rest upon a tortfeasor's intentional action, a ___________ finding about what Miles "should have known" is insufficient for a finding of an actual unlawful intent, whether one defines that "intent" in terms of a "purpose" or, more broadly, as a "belie[f] that the consequences are substantially certain to result from [the act]." Restatement (2d) 8A (1965). The Massachusetts courts have ________________ made clear that a defendant "aids and abets" a tortfeasor only if, at the least, the defendant actually knows about _____ "its substantial, supporting role in an unlawful enterprise." Kyte, 556 N.E.2d at 1028. Similarly, the ____ Massachusetts courts have held that a defendant acts "in concert" with a tortfeasor only if the defendant "agrees" to work toward the unlawful result. See, e.g., id. at 1027-28; ___ ____ __ Gurney v. Tenney, 84 N.E. 428 (Mass. 1908). Without actual ______ ______ knowledge that Pars was hiding negative tests, Miles can neither have known of Pars unlawful (i.e., fraudulent) objective nor have agreed to help achieve it. Second, insofar as Maruho tries to predicate liability upon Miles' negligence, a jury could find, at the very worst, nothing more than a negligent failure to act _______ upon a suspicion, that is, an omission on Miles' part. To -10- 10 predicate tort liability upon a negligent omission, one must find a special relationship, between defendant and plaintiff, that imposes a duty upon the defendant to take positive steps to protect the plaintiff. See Restatement ___ ___________ (2nd) 291 comment f (negligent "nonfeasance" requires a _____ special relationship), 314 & comments a, c (1965) (stating the general rule that liability for failure to take action for the aid or protection of another is limited to situations in which there exists some special relationship between the parties). We are not aware of any authority suggesting that the simple relationship "licensor/sublicensee" automatically, by itself, creates ___ such a duty. The exceptional situations in which authority supports the existence of such a duty are not present here. See id. 314A-324A (listing exceptions to the general rule ___ __ of non-liability, none of which encompasses the licensor- sublicensee relationship). Finally, Maruho has not argued any other ground that might support the existence of the necessary duty. We therefore agree with the district court that no such duty existed. 3. Maruho argues that Miles has violated chapter 93A of the Massachusetts General Laws by engaging in an "unfair or deceptive act or practice." Mass. Gen. L. ch. -11- 11 95, 11. But, to prove a violation, Maruho must show conduct that involves some kind of "rascality." Tagliente _________ v. Himmer, 949 F.2d 1, 7 (1st Cir. 1991). Maruho has cited ______ no authority that would justify such a finding where a licensor has only suspicion, not actual knowledge, of a licensee's improper conduct, and where the licensor has no duty to act to protect the potential victim. The circumstances simply do not indicate "rascal-like" behavior on Miles' part. We therefore do not believe the Massachusetts courts would find a violation of the chapter. III Vicarious Liability ___________________ Maruho says that, even if Miles is without fault, it is nonetheless "vicariously" liable for the harm Pars caused, either because Pars was Miles' agent, or because Miles and Pars were engaged in a "joint venture" (or "joint enterprise"). The theories of vicarious liability that Maruho argues, however, all require Maruho to show that Miles had the legal right to control Pars' negotiating activity. See, e.g., Lyon v. The Ranger III, 858 F.2d 22, ___ ____ ____ ______________ 27 (1st Cir. 1988) (joint enterprise exists where participants "'ha[ve] an equal right to direct and control the conduct of the other[s] concerning acts or omissions -12- 12 which cause, or contribute to the causation of, injury.'" (quoting Adams v. Dunton, 187 N.E. 90, 92 (Mass. 1933)); _____ ______ Payton v. Abbott Labs, 512 F. Supp. 1031, 1036 (D. Mass. ______ ___________ 1981) (joint venture requires "joint [but not necessarily equal] control of the objectives of the undertaking and of the means of achieving those objectives"); Restatement ___________ (Second) of Agency 1 comments a, b (1958); W. Page Keeton __________________ et al., Prosser and Keeton on the Law of Torts 72, at 519- ______________________________________ 20 (5th ed. 1984) (joint enterprise requires something that shows a mutual right of control). Yet Maruho can make no _____ such showing here. The licensing agreement between Miles and Pars did not give Miles any right to participate in or control the negotiation and granting of sublicenses. And the record provides no evidence of any statement, or action, by Miles that suggests any right to control Pars' negotiating activity. We concede that, sometimes, a jury might use evidence of actual control as a basis for inferring the existence of a corresponding legal right. But here, there was no actual control. Miles did not even know that Pars and Maruho were negotiating a sublicense until the negotiations were already roughly seven months old; and it first learned the terms of the proposed contract -- such as -13- 13 the fee Maruho was to pay for the sublicense -- only a few weeks before the contract was scheduled to take effect. Maruho nevertheless argues that Miles' legal ability to grant, or deny, Pars a needed extension of the basic license permitted Miles to influence the terms of, or to benefit from, the sublicense. But, we have no reason to believe that the simple, unexercised, practical power to influence a negotiation could, by itself, create an agency, or joint venture (or enterprise), for otherwise, every negotiator would discover himself the agent of, or venturer with, any of the many persons who might influence the negotiations. We are not surprised that we could find no legal authority supporting such a proposition. We add that the simple fact that Miles might have benefitted from the sublicense (through the royalty-sharing provision in the Miles/Pars license agreement) does not make Miles vicariously liable for Pars' conduct. See, e.g., Payton, ___ ____ ______ 512 F. Supp. at 1036 (recognizing that profit sharing and ___ joint control are central to a joint venture); Stock v. _____ Fife, 430 N.E.2d 845, 847-48 (Mass. App. Ct. 1982) (absent ____ joint control, a common (pecuniary) interest is not enough to establish a joint enterprise). IV -14- 14 Unjust Enrichment _________________ Maruho argues that Miles was "unjustly enriched" by having received a share of the $3 million sublicense fee, and that it must therefore "return" the share to Maruho. See Restatement of Restitution 1 (1937) ("A person who has ___ __________________________ been unjustly enriched at the expense of another is required to make restitution to the other."). The controversial part of this argument, however, lies in its premise. Did Miles ever receive a portion of the $3 million? The relevant facts are not in dispute. Miles and Pars disagreed about whether Miles was entitled to some of Maruho's $3 million sublicense fee. Miles argued that the fee was a "royalty," in which case it was entitled to one- half. Pars argued that the entire sum represented a return of Xorphanol development expenses, in which case Miles was entitled to nothing. Miles and Pars then agreed that Pars would deposit $1,350,000 of the fee into an escrow account and retain the remainder. The escrow agreement provided that the money "shall remain in escrow" until a. The Parties . . . either reach a satisfactory agreement as to . . . distribution; or b. A final decision is reached by arbitration . . .; or, -15- 15 c. In the event the Parties cannot agree to arbitration, a final decision on the distribution . . . is rendered by an appropriate court . . . . Eventually, Miles decided not to bring a legal proceeding and permitted Pars to take the money from escrow. For Maruho to obtain "restitution" from Miles, it must show, at a minimum, that Miles had "possession of or some other interest in" this money. Restatement of _______________ Restitution 1 comment b. But Miles never did have ___________ possession of the money. The interest that it had (in the absence of an agreement from Pars as to distribution) consisted of little more than a right to bring a lawsuit to obtain money to which its legal right (the record indicates) was highly uncertain. And, since Pars would not agree, the escrow served only to isolate and protect the money from other potential Pars creditors while Miles made up its mind whether or not to bring suit. This kind of interest -- at best analogous to an attachment -- seems to us too slight to count as the kind of benefit that might support a suit for restitution. This undefined interest is not analogous to that of a joint owner in a joint bank account. We can find no convincing analogy to any other kind of joint ownership. Nor does the record, read favorably to Miles, show anything of value that Miles -16- 16 received for releasing the escrow. (It shows no "promise" by Pars to engage in development work that it would not otherwise have undertaken.) The record shows only that Miles, for a time, thought it had a right to the money and convinced Pars (in part through its power to extend, or not to extend, the basic license) to place the money in escrow while Miles decided whether or not to sue. (If there was some more tangible interest here, Maruho at least had the burden of showing just what it consisted of, but Maruho did not even try to do so.) We are not surprised that we could find no authority supporting the proposition that such an "interest" falls within the scope of the Restatement's description of "enrichment," while we found contrary authority directly on point. Gilpin v. AFSCME, AFL-CIO, 875 ______ _______________ F.2d 1310, 1314-15 (7th Cir.), cert. denied, 493 U.S. 917 _____________ (1989). The authority that Maruho cites, Gill Equipment Co. __________________ v. Freedman, 158 N.E.2d 863 (Mass. 1959), says that a person ________ may be "unjustly enriched" by money that he does "possess" ____ under a constructive trust created by his promise to assume "personal responsibility," which trust he violates by later ________ ______________ giving the money to another. That case is not on point. For these reasons the judgment of the district court is -17- 17 Affirmed. ________ -18- 18