NORTH STAR STEEL TEXAS,
INC., Plaintiff,

v.

ENTERGY GULF STATES, INC. and
Entergy Corporation Defendants.

No. CIV. A. H–97–3994.

United States District Court,
S.D. Texas,
Houston Division.

Sept. 29, 1998.

Scott Monroe Clearman, McClanahan & Clearman, Houston, TX, Philip Chabot, Jr., Foster De Reitzes, Lynn H. Johanson, Washington, DC, for Plaintiff.

Lawrence Louis Germer, Germer & Gertz, Houston, TX, Alan H. Katz, Entergy Services Inc., New Orleans, LA, O.H. Storey, III, Entergy Services Inc., Corporate Counsel, Little Rock, AR, Kevin McGrath, Clark Thomas & Winters, Dick Westerburg, Entergy Services Inc., Austin, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

LAKE, District Judge.

Unhappy with the price it pays for electricity, the owner of a steel mill sued under the Sherman and Clayton Acts to force a regulated electric utility to acquire electrical power from a less expensive source and pass the savings on to the steel mill. The utility seeks immunity from the suit under the antitrust state-action doctrine. Pending before the court is defendants' Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6), or in the Alternative, Motion for Summary Judgment (Docket Entry No. 7). For the reasons stated below, the court will grant the motion.

## I. BACKGROUND

North Star Steel Texas, Inc., ("North Star"), a company organized under Delaware corporate law, is a wholly owned subsidiary of Cargill, Inc., a privately held corporation based in Minneapolis, Minnesota. North Star produces steel wire rod of various sizes and qualities at a steel mill in Beaumont, Texas. Instead of manufacturing the steel from scratch, the company melts down scrap steel. It then refines the steel and shapes it into a finished product. The melting, refining, and shaping processes consume a substantial amount of electrical power.[1]

Defendant, Entergy Corporation, is a public utility holding company providing electrical power through its subsidiaries to approximately 2.5 million customers in Arkansas, Louisiana, Mississippi, and Texas. Defendant, Entergy Gulf States, Inc., is one of those subsidiaries. (Entergy Corporation and Entergy Gulf States, Inc. will collectively be referred to as "Entergy.") This subsid-

---

1. Original Complaint ¶ 6.

iary generates and sells electrical power in Louisiana and southeast Texas to approximately 600,000 customers, including North Star. North Star alleges (and Entergy does not dispute) that Entergy owns and operates the only power transmission lines capable of serving North Star's steel mill in Beaumont.[2]

On March 9, 1994, North Star entered an agreement with Gulf States Utilities Co. (predecessor in interest of Entergy Gulf States, Inc.) to provide electrical services to the Beaumont mill.[3] Dissatisfied with its electric power costs under this contract, North Star began looking for alternative energy suppliers. In an effort to reduce the price it paid for electricity, North Star submitted two alternative plans to Entergy for using a third-party supplier of electricity. First, North Star proposed "earmarked power." Under such an arrangement Entergy would purchase power from a third party for specific distribution to North Star. North Star would then purchase this allocated power from Entergy at a negotiated price. Earmarked power was North Star's preferred arrangement. In the alternative, North Star proposed "retail wheeling." In this arrangement North Star would purchase power directly from a third party and pay Entergy to deliver it over Entergy's power lines to North Star's Beaumont mill.[4] Presumably, the third-party generator would charge less for generating the wheeled or earmarked power consumed by North Star than Entergy, thereby reducing North Star's electricity bill. Under both arrangements, Entergy would no longer generate the electricity consumed by North Star, but Entergy would continue to deliver it.[5]

On October 28, 1997, North Star sent Entergy a letter requesting that the parties begin negotiations to purchase power generated by a third party.[6] Entergy responded on November 6, 1997, informing North Star that its mill was not eligible for either of the proposed arrangements.[7] North Star replied on November 12, 1997, declaring that it interpreted Entergy's November 6 letter as a denial of its requests.[8]

On December 8, 1997, North Star filed this action against Entergy, alleging three claims under the Sherman and Clayton Acts, 15 U.S.C. §§ 1–7, 12–27 (1994):

  (1) refusal to deal;

  (2) monopolization of an essential facility; and

  (3) unlawful tying.

While Entergy has not answered North Star's complaint, it has filed a motion to dismiss or for summary judgment, asserting immunity from antitrust liability under the state action doctrine.

## II. STANDARD OF REVIEW

▮▮▮ Because the parties have submitted material outside the pleadings, Entergy's motion "shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b); *see Young v. Biggers*, 938 F.2d 565, 568 (5th Cir.1991); 5A Charles Alan Wright & Arthur R. Miller,

---

2. Original Complaint ¶ 7.

3. Agreement for Electric Service, Affidavit of Roberta Whitley (Entergy's Account Manager), Exhibit A.

4. Affidavit of Michael J. Sarafolean (Energy Procurement Manager at North Star) ¶¶ 3–4; October 28, 1997, letter from Philip L. Chabot, Jr. to Andrew Kever, Sarafolean Affidavit, Exhibit A.

5. Physically speaking this is impossible. North Star's proposals rely on a legal fiction: the contract path. This fiction assumes that the electricity delivered to a particular customer passes directly to the customer from a designated power generation facility only along certain power lines. *See* Lee A. Rau, *Open Access in the Power Industry: Competition, Cooperation, and Policy Dilemmas*, 64 Antitrust L.J. 279, 286 (1996); David J. Rosso, *Transmission Access—A Crucial*

*Issue for an Industry*, 123 Pub. Util. Fort., Feb. 16, 1989, at 18, 20. Electricity, however, follows the path of least resistance through a circuit, which is not necessarily the path negotiated in a contract. No utility company can control which particular electron travels to any end-user, unless the end-user is the only power consumer on the circuit.

6. October 28, 1997, letter from Philip L. Chabot, Jr. to Andrew Kever, Sarafolean Affidavit, Exhibit A.

7. November 6, 1997, letter from Kever to Chabot, Sarafolean Affidavit, Exhibit B.

8. November 12, 1997, letter from Chabot to Kever, Sarafolean Affidavit, Exhibit C.

*Federal Practice and Procedure* § 1366, at 493–501 (2d ed.1990). Because both parties treated Entergy's motion as one for summary judgment, the court concludes that both parties have received and used a "reasonable opportunity to present all material made pertinent" to Entergy's motion. Fed. R.Civ.P. 12(b); *see Maruho Co. v. Miles, Inc.,* 13 F.3d 6, 8 (1st Cir.1993). The court therefore does not need to delay its decision by providing additional time for the parties to present material relevant to Entergy's motion. *See Maruho Co.,* 13 F.3d at 8.

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.,* 92 F.3d 336, 338 (5th Cir.1996); *Rogers v. International Marine Terminals, Inc.,* 87 F.3d 755, 758 (5th Cir.1996). The Supreme Court has interpreted the plain language of Rule 56(c) as mandating "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see Gunaca v. Texas,* 65 F.3d 467, 469 (5th Cir.1995).

A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*) (quoting *Celotex,* 106 S.Ct. at 2553, 106 S.Ct. 2548). "The movant accomplishes this by informing the court of the basis for its motion, and by identifying portions of the record which highlight the absence of genuine factual issues." *Rizzo v. Children's World Learning Ctrs., Inc.,* 84 F.3d 758, 762 (5th Cir.1996) (citing *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.1992)). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little,* 37 F.3d at 1075.

If, however, the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and to show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *EEOC v. Texas Instruments Inc.,* 100 F.3d 1173, 1180 (5th Cir.1996); *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1046–47 (5th Cir.1996). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a mere scintilla of evidence. *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075.

Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Wallace,* 80 F.3d at 1047; *accord, S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 494 (5th Cir.1996). The court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.), *as modified,* 70 F.3d 26 (5th Cir.1995). Unless there is sufficient evidence for a reasonable jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Texas Instruments Inc.,* 100 F.3d at 1179.

When affidavits are used to support or oppose a motion for summary judgment they "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e); *Beijing Metals & Minerals Import/Export Corp. v. American Bus. Ctr., Inc.,* 993 F.2d 1178, 1182 (5th Cir.1993). Affidavits that are not based on personal knowledge or that are based merely on information and belief do not satisfy the requirements of Rule 56(e), and those portions of an affidavit that do not comply with Rule 56(e) are not entitled to any weight and cannot be considered in deciding a motion for summary judgment. *Richardson v. Oldham,* 12 F.3d 1373, 1378–

79 (5th Cir.1994). Neither shall conclusory affidavits suffice to create or negate a genuine issue of fact. *McCallum Highlands, Ltd.*, 66 F.3d at 92; *Travelers Ins. Co. v. Liljeberg Enters., Inc.*, 7 F.3d 1203, 1207 (5th Cir.1993); *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir.1992).

■ Immunity under the antitrust state-action doctrine is an affirmative defense. *See Destec Energy, Inc. v. Southern Cal. Gas Co.*, 5 F.Supp.2d 433, 445 (S.D.Tex.1997). Therefore, to the extent that the state-action defense calls for factual findings, Entergy must establish with competent summary judgment evidence each element of the defense in order to prevail on its motion for summary judgment. *See David L. Aldridge Co. v. Microsoft Corp.*, 995 F.Supp. 728, 742 (S.D.Tex.1998). North Star may avoid summary judgment by identifying a fact issue on any element of the defense.

### III. DISCUSSION

North Star sued Entergy under the Sherman and Clayton Acts, alleging three types of antitrust claims:

(1) refusal to deal;

(2) monopolization of an essential facility; and

(3) unlawful tying.

Entergy claims it is immune from any antitrust liability under the state action doctrine.

■ Under the state action doctrine state regulatory programs are immune from antitrust liability. *See DFW Metro Line Servs. v. Southwestern Bell Tel. Corp.*, 988 F.2d 601, 604 (5th Cir.1993). The immunity extends not only to state agencies but also to private individuals and corporations. *See Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 1729, 85 L.Ed.2d 36 (1985); *Earles v. State Bd. of Certified Pub. Accountants*, 139 F.3d 1033, 1040 (5th Cir.1998), *petition for cert. filed*, —— U.S. ——, 119 S.Ct. 444, —— L.Ed.2d —— (1998). To qualify for immunity a defendant must establish that

(1) it acted "pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with state regulation," and

(2) the state actively supervises this policy.

*Earles*, 139 F.3d at 1041; *accord California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980); *DFW Metro Line Servs.*, 988 F.2d at 605. Entergy argues that the Texas Legislature has adopted in clear and affirmative terms a policy to displace competition in the market for electrical power with a comprehensive regulatory scheme under the Public Utilities Regulatory Act (PURA), Tex. Util.Code §§ 11.001–63.063 (Vernon 1998). Entergy also argues that the state of Texas actively supervises its policies towards the electrical power industry through the Public Utility Commission of Texas (PUC).

### A. Texas's Regulatory Policy for Electrical Utilities

■ To satisfy the first element of a state action defense Entergy must show that it acted pursuant to a clearly articulated, affirmatively expressed state policy to displace competition with regulation. A permissive policy that allows anticompetitive conduct, but does not require it, will also satisfy this element. *See Southern Motor Carriers Rate Conference, Inc.*, 105 S.Ct. at 1728. Moreover, the state need not have explicitly permitted the conduct at issue; "it is enough if such suppression of competition was the 'foreseeable result' of what the state authorized." *Martin v. Memorial Hosp.*, 86 F.3d 1391, 1399 (5th Cir.1996).

In 1975 the Texas Legislature enacted the PURA, now codified as Title 2 of the Texas Utilities Code, to regulate the electric and telecommunications utilities in Texas. Section 11.002 explains the purpose of the PURA:

(a) This title is enacted to protect the public interest inherent in the rates and services of public utilities. The purpose of this title is *to establish a comprehensive and adequate regulatory system for public utilities* to assure rates, operations, and services that are just and reasonable to the consumers and to the utilities.

(b) Public utilities traditionally are by definition monopolies in the areas they serve.

As a result, the normal forces of competition that regulate prices in a free enterprise society do not operate. *Public agencies regulate utility rates, operations, and services as a substitute for competition.* Tex. Util.Code Ann. § 11.002 (Vernon 1998) (emphasis added).

The legislature enacted section 11.002 as part of Subtitle A, which expressly applies to entities that "produce, generate, transmit, distribute, sell, or furnish electricity in this state." *Id.* §§ 11.004(a); 31.002(1). The legislature also used virtually identical language to explain its specific regulatory policy towards electric utilities:

> (a) This subtitle [B] is enacted to protect the public interest inherent in the rates and services of electric utilities. The purpose of this subtitle is *to establish a comprehensive and adequate regulatory system for electric utilities* to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities.
>
> (b) Electric utilities are by definition monopolies in many of the services provided and areas they serve. As a result, *the normal forces of competition that regulate prices in a free enterprise society do not always operate. Public agencies regulate utility rates, operations, and services except as otherwise provided by this subtitle [B].*

*Id.* § 31.001(a)-(b) (emphasis added).

The Texas Supreme Court has explained that "[t]he purpose of the Act is to establish a comprehensive regulatory system over the rates, services, and operations of the public utilities." *City of Coahoma v. Public Util.*

*Comm'n,* 626 S.W.2d 488, 489 (Tex.1981). The Fifth Circuit reached the same conclusion in *DFW Metro Line Services v. Southwestern Bell Telephone Corp.,* 988 F.2d 601, 605 (5th Cir.1993). In *DFW Metro Line* a flat rate telephone service provider sued Southwestern Bell under the Sherman Act when Southwestern Bell increased the rates that it charged the provider for leasing telephone lines. *See id.* at 602. Southwestern Bell raised the state action defense. The Fifth Circuit held that § 11.002 of the PURA (then codified at Tex.Rev.Civ. Stats. Ann. art. 1446c, § 2 (Vernon Supp.1993)), which provides a general policy statement for both telecommunications and electric utilities, satisfied the first prong of the state action defense. *See id.* at 605. While the PURA contained a separate policy statement that only applied to telecommunications utilities,[9] the Fifth Circuit did not even mention it and instead relied on § 11.002, the general policy statement of the PURA applicable to all utilities governed by the Act. Thus, the Fifth Circuit has already concluded that § 11.002 expresses a clearly articulated and affirmatively expressed policy to displace competition with regulation in the electric utility industry. *See also City of College Station, Tex. v. City of Bryan, Tex.,* 932 F.Supp. 877, 886–87 (S.D.Tex.1996) (reciting the *DFW Metro Line* holding and concluding that even the amended version of the PURA expresses an intent to regulate the competitive wholesale electric utility industry).

North Star ignores these precedents, however, and argues that Texas has not expressed a policy to displace competition with regulation in the narrow market for electrical

---

9. At the time of the Fifth Circuit's decision the legislative policy statement for the telecommunications industry provided:

> It is the policy of this state to protect the public interest in having adequate and efficient telecommunications service available to all citizens of the state at just, fair, and reasonable rates. The legislature finds that the telecommunications industry through technical advancements, federal judicial and administrative actions, and the formulation of new telecommunications enterprises has become and will continue to be in many and growing areas a competitive industry which does not lend itself to traditional public utility regulatory rules, policies, and principles; and that therefore, the public interest requires that new rules, policies, and principles be formulated and applied to protect the public interest and to provide equal opportunity to all telecommunications utilities in a competitive marketplace. It is the purpose of this section to grant to the [PUC] the authority and the power under this Act to carry out the public policy herein stated.

Act effective Sept. 1, 1975, 64th Leg., R.S., ch. 721, § 18(a), 1975 Tex. Gen. Laws 2327 (amended 1995) (current version at Tex. Util.Code Ann. §. 51.001 (Vernon 1998)).

power *generation.*[10] Given statutory provisions opening up competition for *wholesale* electrical generation, *see* Tex. Util.Code Ann. §§ 35.001–.007 (Vernon 1998), North Star argues that the legislature did not design the present regulatory system to displace competition in the generation of electricity but instead "to address the fact that the state's system of exclusive service territories has displaced horizontal competition in the *distribution* market."[11]

It is true that the Texas Legislature has expressed its view that the wholesale electric industry is growing more competitive. Indeed, § 31.001(c), codified after the regulatory policy statement for electric utilities, states:

> The wholesale electric industry, through federal legislative, judicial, and administrative actions, is becoming a more competitive industry that does not lend itself to traditional electric utility regulatory rules, policies, and principles. As a result, the public interest requires that rules, policies, and principles be formulated and applied to protect the public interest in a more competitive marketplace. The development of a competitive wholesale electric market that allows for increased participation by electric utilities and certain nonutilities is in the public interest.

Tex. Util.Code Ann. § 31.001(c) (Vernon 1998).[12]

The Legislature has also enacted several provisions under chapter 35, subchapter A of the Texas Utility Code relating to this more competitive wholesale generation industry.

However, subchapter A and § 31.001(c) speak only to the *wholesale* power industry. Both North Star's earmarked power proposal and its wheeling proposal involve retail power sales because the third-party generator would sell its electricity to North Star, the end-user. *See* Tex. Pub. Util. Comm'n Office of Regulatory Affairs, *1996 Statewide Electrical Energy Plan for Texas* at 29 (June 1996) (Entergy's Reply to North Star's Answer in Opposition to Defendants' Motion to Dismiss [Docket Entry No. 30], Appendix G) ("Industrial sales are classified as retail sales[,] and current laws and regulations that allow competition in wholesale markets also prevent retail customers from shopping around for a low-cost power supplier."); *see also Power Clearinghouse, Inc. v. Public Util. Comm'n*, 968 S.W.2d 537, 540 (Tex. App.-Austin 1998, no pet. h.) (adopting common definitions of the terms "wholesale" and "retail" in affirming the PUC's denial of a power marketer's request for a wheeling order). Thus, to the extent the legislature relaxed its regulatory policy towards wholesale power generation, it implicitly maintained the more strenuous policies towards retail power generation expressed in §§ 11.002 and 31.001(a)-(b) under the canon *expressio unius est exclusio alterius.*[13]

**10.** North Star's argument relies on a questionable economic theory that the electric power industry is actually composed of three separate product markets: the markets for power generation, power transmission, and power distribution. This theory ignores fundamental laws of physics. Electric generators produce no electrical power unless connected to a completed electrical circuit. Power transmission and distribution lines serve no function unless the lines carry an electric current. So it is questionable whether the three product "markets" are in fact separate given that their products do not exist independently. *See* 10 Phillip E. Areeda, et al., *Antitrust Law* ¶¶ 1743a–1750 (1996) (synthesizing an analytical regime for determining whether bundled items or services constitute one product or multiple products for the purposes of evaluating an antitrust tying claim); *But see, e.g., Town of Massena v. Niagara Mohawk Power Corp.*, 1980–2 Trade Cases ¶ 63526, 1980 WL 1889 (N.D.N.Y. Sept.8, 1980) (adopting the three-product-market theory for the electric

power industry). However, because the court concludes that Texas's regulatory policy includes regulation of power generation (both wholesale and retail), it is unnecessary to identify relevant product markets at this time or to decide whether electric power generation is a separate product market.

**11.** North Star's Memorandum of Points and Authorities in Support of its Answer in Opposition to Defendants' Motion to Dismiss [Docket Entry No. 18] at 13–14. (emphasis in original)

**12.** This language is very similar to the statutory statement of policy towards the telecommunications industry in effect at the time of the *DFW Metro Line* decision. *See supra* note 9.

**13.** Moreover, a brief examination of chapter 35 demonstrates that Texas has not eliminated regulation of the wholesale generation industry, but instead has simply established a different set of regulations for that industry. Chapter 35 allows

■ Moreover, even if the PURA had not expressly stated an intent to displace competition in the retail power industry, suppression of competition in retail generation of electrical power "was the 'foreseeable result' of what the state authorized" in the PURA. *See Martin v. Memorial Hosp.*, 86 F.3d 1391, 1399 (5th Cir.1996). Section 37.051(a) requires that electric utilities obtain a certificate from the PUC before they may provide direct or indirect retail service to the public. Section 37.051(b) forbids retail electric utilities from providing service to areas already lawfully served by another retail utility. A third-party provider of electric power is an electric utility under the PURA. *See* Tex. Util.Code Ann. § 31.002(1) (Vernon 1998) (defining the term "electric utility"). Generating electric power is a utility service. *See id.* § 11.003(18) (defining the term "service" broadly and including "anything supplied" under the statutory definition). These provisions convince the court that the legislature anticipated that certificated electrical utilities would refuse to wheel or earmark retail power for consumers when it decided to displace competition with regulation in the PURA.

All of North Star's arguments rely on the premise that while the legislature might have intended to regulate much of the electrical power industry, it had no intention of displacing competition in retail power generation, or at least did not clearly articulate or affirmatively express its intention to do so. The court is not persuaded by this argument. The court is convinced that the legislature intended to displace competition with regulation in the electrical power industry in general and in retail power generation in particu-

lar. While the PURA might not compel Entergy to refuse to wheel or buy earmarked power, the PURA permitted Entergy to do so. Such a permissive policy will suffice under the first element of the state action defense. *See Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 1728, 85 L.Ed.2d 36 (1985); *Earles v. State Bd. of Certified Pub. Accountants*, 139 F.3d 1033, 1043 (5th Cir. 1998), *petition for cert. filed*, —— U.S. ——, 119 S.Ct. 444, —— L.Ed.2d —— (1998). The court therefore concludes that Entergy acted pursuant to a clearly articulated and affirmatively expressed policy to displace competition with regulation in the electric utility industry.

## B.   Active Supervision

■ In order for Entergy to enjoy state action immunity it must also establish that the state actively supervises administration of its regulatory policy. The PURA provides for extensive supervision of the electrical power industry by the PUC. Under the PURA, the PUC regulates an electric utility's:

(1) rates,[14]

(2) services,[15]

(3) service territories,[16]

(4) record keeping,[17]

(5) accounting,[18]

(6) sale of property and mergers,[19]

(7) relationship with affiliates,[20] and

---

a "provider of generation" to compete for power sales, and it allows electric utilities to purchase power. *See* Tex. Util.Code Ann. §§ 35.002, 35.003(a) (Vernon 1998). Section 35.004(a) requires that owners of transmission facilities provide wholesale transmission service at rates comparable to its own internal costs. However, the PUC still maintains regulatory oversight of the system. *See id.* §§ 35.004(b)-(c), 35.005-.007. Ultimately, the PUC and not the market determines whether a utility's conduct is economically reasonable. *See id.* § 35.005(a). And the statute still requires that the PUC adopt rules to govern the wholesale transmission of electricity. *See id.* § 35.006(a). The state of Texas has thus adopted a clear and affirmative policy to regulate wholesale power generation.

**14.**   *See* Tex. Util.Code ch.  36 (Vernon 1998).

**15.**   *See id.* ch. 38.

**16.**   *See id.* ch. 37.

**17.**   *See id.* §§ 14.003–.004, 14.151–.207, 32.102–.104.

**18.**   *See id.* §§ 14.201–.207, 36.055–.056.

**19.**   *See id.* § 14.101(a)-(b).

**20.**   *See  id.* §§ 14.003(5)(A), 14.003(6), 14.154, 35.003, 36.058.

(8) acquisition of new power supplies and energy efficiency programs.[21]

Unless otherwise approved by the PUC, an electric utility may not directly or indirectly charge nor may a customer knowingly pay more or less for a service than the rate specified in the tariff approved by the PUC. *See* Tex. Util.Code Ann. §§ 36.004, 36.007 (Vernon 1998). Indeed, a utility must obtain PUC approval before it may offer any type of regulated service. *See id.* §§ 36.002, 36.102–.111. This is not a so-called negative option situation, in which a rate or practice becomes effective unless the state regulatory agency rejects it within a specified time. *See, e.g., Federal Trade Comm'n v. Ticor Title Ins. Co.,* 504 U.S. 621, 112 S.Ct. 2169, 2179, 119 L.Ed.2d 410 (1992); *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 1723, 85 L.Ed.2d 36 (1985). In Texas the PURA explicitly forbids utilities from providing electrical service or offering a new rate without express permission from the PUC.

■■■ North Star concedes that Entergy could not wheel or earmark power without first obtaining approval from the PUC.[22] Nonetheless, it contends that while the PUC regulates the "rates, terms, and conditions of service," such regulation "cannot be deemed to constitute active supervision of a policy, practiced by Entergy, to displace competition in the generation market or tie the purchase of transmission to the purchase of generation."[23] North Star's argument is premised on the incorrect contention that the PUC regulates *conditions* of service, when in fact the Commission has jurisdiction over "the rates, *operations,* and *services* " of electric utilities. Tex. Util.Code Ann. § 32.001(a) (Vernon 1998) (emphasis added). North Star

is therefore wrong when it argues that the PUC does not supervise transmission and power generation, which are operations and services of electric utilities. *See id.* § 11.003(18) (defining service as including "any act performed, *anything supplied,* and *any facilities used or supplied* by a public utility in the performance of the utility's duties") (emphasis added).

North Star also argues that the PUC does not actively supervise wheeling and earmarked power transactions because the PUC will exercise its jurisdiction "*only* if [Entergy] consents to submit North Star's proposal" to it.[24] According to North Star, the PUC can approve North Star's retail wheeling or earmarking requests only if Entergy requests approval. This is not correct. First, the third-party generator would have to seek a certificate from the PUC before it could provide service to North Star. *See id.* §§ 36.002, 36.102–.111. Thus, North Star is incorrect to the extent that it argues that *only* Entergy could bring North Star's proposed arrangements to the PUC.

Second, and more importantly, North Star itself has the right to complain to the PUC about allegedly unlawful acts or omissions by Entergy:

> An affected person may complain to the regulatory authority [PUC] in writing setting forth an act or omission by a public utility in violation or claimed violation of a law that the regulatory authority has jurisdiction to administer or of an order, ordinance, or rule of the regulatory authority.

*Id.* § 15.051(a).[25]

An affected person may also complain to the PUC about electric rates and seek an order to change them. *See id.* § 36.151(a).

---

**21.** *See id.* ch. 34.

**22.** North Star's Memorandum of Points and Authorities in Support of its Answer in Opposition to Defendants' Motion to Dismiss [Docket Entry No. 18] at 14, 17.

**23.** North Star's Memorandum of Points and Authorities in Support of its Answer in Opposition to Defendants' Motion to Dismiss [Docket Entry No. 18] at 15.

**24.** North Star's Memorandum of Points and Authorities in Support of its Answer in Opposition

to Defendants' Motion to Dismiss [Docket Entry No. 18] at 18.

**25.** The PURA defines an "affected person" as:

> (A) a public utility affected by an action of a regulatory authority;
> (B) a person whose utility service or rates are affected by a proceeding before a regulatory authority; or
> (C) a person who:
> (i) is a competitor of a public utility with respect to a service performed by the utility; or

The PUC reviews complaints from rate payers about their utility's rates and services. *See, e.g.,* Tex. Pub. Util. Comm'n, *Swaim v. Texas Utils. Elec. Co.,* Docket No. 13727, 21 Tex. P.U.C. Bull. 345, 1995 WL 868168 (Oct. 11, 1995) (dismissing a complaint over high electricity bills); Tex. Pub. Util. Comm'n, *Quigly v. New Era Elec. Coop., Inc.,* Docket No. 12717, 20 Tex. P.U.C. Bull. 541, 1994 WL 762763 (Nov. 23, 1994) (examining a customer's claim that the cooperative overcharged him); Tex. Pub. Util. Comm'n, *Destec Energy, Inc. v. Houston Lighting & Power Co.,* Docket No. 12298, 20 Tex. P.U.C. Bull. 419, 1994 WL 762789 (Apr. 29, 1994) (considering a request to order the utility to alter its services to the customer); Tex. Pub. Util. Comm'n, *Kay v. Houston Lighting & Power Co.,* Docket No. 11822, 19 Tex. P.U.C. Bull. 1297, 1993 WL 603204 (Sept. 13, 1993) (reviewing a denial-of-service claim); Tex. Pub. Util. Comm'n, *Pace v. Houston Lighting & Power Co.,* Docket No. 11307, 18 Tex. P.U.C. Bull. 1160, 1992 WL 465300 (Nov. 12, 1992) (examining a claim of excessive rates).

More particularly, the PUC has considered several proposals similar in substance to North Star's wheeling and earmarking requests. Recently, a power marketer urged the PUC to adopt so-called "by-through" rates that would allow customers to designate their power supplier and require Central Power & Light Company (CP & L) to charge only for distribution and administrative services. A panel of administrative law judges recommended against adopting the power marketer's proposal. *See* State Office of Admin. Hearings, *Application of Central Power and Light Company for Authority to Change Rates,* SOAH Docket No. 473–95–

1563, PUC Docket No. 14965 (undated) (Proposal for Decision) (Entergy's Reply to North Star's Answer in Opposition to Defendants' Motion to Dismiss [Docket Entry No. 30], Exhibit J). Although the PUC did not explicitly discuss this recommendation, it also declined to alter CP & L's rates, implicitly rejecting the by-through proposal. *See* Tex. Pub. Util. Comm'n, *Re Central Power & Light Company,* Docket No. 14965, 176 P.U.R.4th 397, 1997 WL 197437 (Mar. 31, 1997) (Order).

The PUC has even considered a challenge to a utility's refusal to wheel or earmark power and declined to order the utility to open its transmission lines to a third-party generator. *See, e.g., Power Clearinghouse, Inc. v. Public Util. Comm'n,* 968 S.W.2d 537, 538 (Tex.App.-Austin 1998, no pet. h.). In fact, Entergy alleges (and North Star does not dispute) that North Star has actively intervened in Entergy's pending rate case before the PUC,[26] but that North Star has not exercised its right to challenge Entergy's refusal to wheel or earmark power.[27]

Finally, the record reflects that Entergy has in fact sought PUC approval of a plan to begin opening up its services to competition. On November 27, 1996, Entergy filed an application for approval of a seven-year plan for transition from a regulated environment to a competitive one in its service area. Entergy's stated intention is to move "from the current monopoly state to one where risks and rewards are a function of performance; [*sic*] where reliability remains an absolute necessity; [*sic*] and, [*sic*] where customer choice becomes the primary driver in what and how services are provided."[28] As part

(ii) wants to enter into competition with a public utility.

Tex. Util.Code Ann. § 11.003(1) (Vernon 1998). "'Person' includes an individual, a partnership of two or more persons having a joint or common interest, a mutual or cooperative association, and a corporation." *Id.* § 11.003(13). North Star is an affected person under § 11.003(1)(B); a third-party generator would be an affected person under § 11.003(1)(A) and (C).

26. Entergy's Reply to North Star's Answer in Opposition to Defendants' Motion to Dismiss [Docket Entry No. 30] at 12 & n. 37.

27. Entergy's Reply to North Star's Answer in Opposition to Defendants' Motion to Dismiss [Docket Entry No. 30] at 2.

28. *See* The Transition to Competition Plan at 2, *Application of Entergy Gulf States, Inc. for Approval of its Transition to Competition Plan and the Tariffs Implementing the Plan, and For Authority to Reconcile Fuel Costs, To Set Revised Fuel Factors, and to Recover a Surcharge for Underrecovered Fuel Costs,* PUC Docket No. 16705 (filed Nov. 27, 1996) (North Star's Memorandum of Points and Authorities in Support of its Answer in Opposition to Defendants' Motion to Dismiss [Docket Entry No. 18], Exhibit 8).

of its plan, Entergy proposed to "unbundle" its generation, transmission, and distribution services in order to promote customer choice.[29] North Star partially opposed Entergy's plan and filed a motion to dismiss the portion of the application in which Entergy sought to recover stranded capital costs.[30] Neither party has advised the court as to the continued pendency before or ultimate decision by the PUC of this matter.

The court concludes that the state of Texas, acting through the PUC, actively supervises administration of its policy to displace competition with regulation in the electrical power industry in general and with respect to retail wheeling and earmarking power in particular. Both North Star and any third-party generator aggrieved by Entergy's refusal to wheel or earmark power may file complaints with the PUC. Indeed, Entergy has sought PUC approval of a plan to open up its services to competition, and North Star has had an opportunity to participate in the PUC's consideration of that plan. The PUC is thus actively supervising Entergy's conduct.

## IV. CONCLUSION AND ORDER

The state of Texas has clearly articulated and affirmatively expressed a policy to displace competition with regulation in the electrical power industry. The PUC, on behalf of the state, actively supervises the implementation of this policy and is presently supervising the issues raised in this case. Pursuant to the state action doctrine, the court therefore concludes that Entergy is immune from suit under the federal antitrust laws. Accordingly, defendants' Motion for Summary Judgment (Docket Entry No. 7) is **GRANTED**, and this action will be **dismissed with prejudice**.

29. *See id.* at 31–39.

30. *See* Motion of North Star Steel Texas, Inc. for Partial Dismissal of Application, *Application of Entergy Gulf States, Inc. for Approval of its Transition to Competition Plan and the Tariffs Implementing the Plan, and For Authority to Reconcile Fuel Costs, To Set Revised Fuel Factors, and to Recover a Surcharge for Underrecovered Fuel Costs,* PUC Docket No. 16705 (filed Jan. 21, 1997) (North Star's Memorandum of Points and Authorities in Support of its Answer in Opposition to Defendants' Motion to Dismiss [Docket Entry No. 18], Exhibit 9).